**DATA CONTROLS NORTH, INC.,
et al., Plaintiffs,**

**v.**

**FINANCIAL CORPORATION OF
AMERICA, INC., et al.,
Defendants.**

**Civ. A. No. HAR 86–745.**

United States District Court,
D. Maryland.

May 23, 1988.

**1048**

Douglas C. Hollman, Richard I. Kovelant, Goldman, Kruger, Kovelant & Hollman, Laurel, Md., for plaintiffs.

Wesley G. Howell, Jr., Larry L. Simms, Roger W. Pincus, Gibson, Dunn & Crutcher, Washington, D.C., Ward B. Coe, III, Nevett Steele, Jr., Whiteford, Taylor & Preston, Baltimore, Md., for defendants.

## MEMORANDUM OPINION

HARGROVE, District Judge.

### INTRODUCTION

The plaintiffs in this case are as follows: Data Controls North, Inc. ("DCN"), a Maryland corporation, Descomp, Inc. ("Descomp"), a Delaware corporation, Thomas Ruger ("Ruger"), an officer and director of both aforementioned companies, his wife Patricia Ruger, Descomp Profit Sharing Plan, an unincorporated pension plan owned by employees of Descomp; and John Greenwell, President, director, and shareholder of DCN. They will be collectively referred to as "Plaintiffs."

The Plaintiffs filed this lawsuit on March 7, 1986, in an attempt to recover losses sustained by trading in common stock of the defendant Financial Corporation of America ("FCA"), and in options to purchase its common stock. In addition to FCA, Plaintiffs have sued William Popejoy, Chairman of the Board and Chief Executive Officer of FCA; FCA Board of Directors members Annelise Graebner Anderson, Robert Barton, Merrill Butler, Edward Johnson, Thomas Kemp, Charles Offer, Lawrence Roos, John Rosenwald, Jr., Ralph Stone, Charles Young; American Savings & Loan ("AS & L"), and additional FCA officers Donald Royer, and John Borer, Jr. (collectively the "Defendants").

Plaintiffs have brought this action pursuant to § 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b) (1982), which prohibits "in connection with the purchase or sale of any security ... [the use of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe," as well as Rule 10b–5 promulgated thereto by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5 (1987). Rule 10b–5 makes it unlawful for any person to "employ any device, scheme, or artifice to defraud," or to "engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." In addition, Plaintiffs have brought claims under § 20(a) of the 1934 Act, 15 U.S.C. 78t(a) (1982), § 17(a) of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. § 77q(a) (1982), and numerous state law and common law counts.

The essence of the Plaintiffs' argument lies in the charge that the Defendants failed to disclose publicly sufficiently precise information on FCA's economic condition for the fourth quarter of 1984 through March of 1985. Plaintiffs allege that Defendants engaged in fraudulent conduct which included, among other allegations, knowingly withholding information about the company in a manner that caused them to suffer losses in connection with their stock and options holdings. They also accuse Defendants of feeding to them (and the public at large) information that did not serve as an accurate indicator of FCA's financial condition, which in turn, caused them to suffer losses in connection with their stock and options holdings. The record indicates that Plaintiffs purchased FCA stock and options in FCA stock from August 17, 1984 to February 22, 1985.

## DISCUSSION

Currently pending before this Court is the Defendants' Motion for Summary Judgment, which has been fully briefed. Defendants and Plaintiffs in this case have filed lengthy memoranda in support and opposition, respectively, of this Motion, accompanied by equally voluminous exhibits. The Defendants have based their Motion on five basic arguments:

(1) The Plaintiffs' alleged losses from options trading are not actionable under the federal securities laws (as charged herein: § 10(b) of the 1934 Act, § 20(a) of this same Act, and § 17(a) of the 1933 Act.);

(2) The Plaintiffs' claim under § 17(a) of the 1933 Act must be dismissed because this section does not confer a private right of action for damages;

(3) The Plaintiffs' claims under the Maryland Securities Act *infra* and the federal securities laws are barred by the Statute of Limitations;

(4) The Plaintiffs' claims must be dismissed because the defendants' statements concerning the company's economic condition were not false or misleading, the defendants did not fail to disclose material information, and the plaintiffs did not rely on these alleged statements, misstatements, and disclosures (or lack thereof);

(5) The Plaintiffs' claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO") (*see infra* at 1051–52) should be dismissed.

■ In their first argument, Defendants maintain that the Plaintiffs' alleged losses from options trading are not actionable under the federal securities laws because the Plaintiffs' options trading did not give rise to a relationship of trust and confidence with the Defendants. *See Chiarella v. United States*, 445 U.S. 222, 230, 100 S.Ct. 1108, 1115, 63 L.Ed.2d 348 (1980). Furthermore, they add, the Plaintiffs cannot establish a "transactional nexus" between their options trading and any trading by the Defendants. *See Starkman v. Warner Communications, Inc.*, 671 F.Supp. 297, 304 (S.D.N.Y.1987) (quoting *Laventhall v. General Dynamics Corp.*, 704 F.2d 407, 412 (8th Cir.1983), *cert. denied*, 464 U.S. 846, 104 S.Ct. 150, 78 L.Ed.2d 140 (1983)).

Plaintiffs claim that their situation is different because they had not only options to purchase, but had actually purchased stock in the issuing company, therefore giving rise to a connection to the issuer of the stock. While some courts have actually extended to options traders a cause of action under the federal securities laws, they have done so only in cases involving affirmative misrepresentations, *e.g.*, *Deutschman v. Beneficial Corp.*, 841 F.2d 502 (3rd Cir. 1988), which have not been demonstrated here, or insider trading, *e.g.*, *Backman v. Polaroid Corp.*, 540 F.Supp. 667 (D.Mass. 1982), a charge which has been dropped from this case per stipulation of the parties.

Most courts addressing this issue have refused to extend a cause of action under § 10(b) of the 1934 Act and the related Rule 10b–5. *See, e.g.*, *Laventhall*, 704 F.2d 407 (8th Cir.1983), *cert. denied*, 464 U.S. 846, 104 S.Ct. 150, 78 L.Ed.2d 140 (1983); *Bianco v. Texas Instruments, Inc.*, 627 F.Supp. 154 (N.D.Ill.1985); *In re McDonnell Douglas Corp. Securities Litigation*, 567 F.Supp. 126 (E.D.Mo.1983). This Court is in accord with the more widely-held view.

It should be emphasized that there is a "vast difference" between shareholders and options traders:

Shareholders own an equity interest in the corporation; options traders do not. Shareholders are involved in desired capital formation; options traders make no contribution to capital or a contributed so attenuated as to be *de minimis*. Although both shareholders and options traders are affected by the corporation's performance, the brute fact is the corporation is run only for the benefit of the shareholders, not options traders. The relationship between shareholders and the corporation is one of trust and confidence, giving rise to a duty owed by the corporation. The nonexistence of a relationship between options traders and the corporation precludes such a duty.

*Deutschman v. Beneficial Corp.,* 668 F.Supp. 358, 362 (D.Del.1987), *rev'd on other grounds,* 841 F.2d 502 (3rd Cir.1988). *See Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 747–49, 95 S.Ct. 1917, 1931–32, 44 L.Ed.2d 539 (1975).

While the Plaintiffs' shareholder status entitles them to standing to pursue appropriate remedies available under § 10(b) of the 1934 Act and Rule l0b–5 promulgated thereto for any alleged losses on their trading of common stock in FCA, this Court is not prepared to extend this right to those who engage in risky speculation such as that found in the options trading game. The Defendants' Motion for Summary Judgment will be granted as to Plaintiffs' claims grounded in their options trading activities.

Upon further examination, however, it is evident that Plaintiffs have produced not one example of affirmative misrepresentation on the part of the Defendants that would give rise to a cause of action for Plaintiffs as stockholders, let alone options traders. There was no evidence of such misrepresentation in the pleadings, and the Plaintiffs failed to produce such evidence upon direct examination by this Court. As the Court cannot rely on speculation, such as that advanced by the Plaintiffs in support of their assertions, summary judgment in favor of the Defendants, is also appropriate as to Plaintiffs' claims grounded in their shareholder status. *See Celotex Corporation v. Catrett,* 477 U.S. 317, 323–325, 106 S.Ct. 2548, 2553–2554, 91 L.Ed.2d 265 (1986).

■ Defendants also claim that Plaintiffs' claim under § 17(a) of the Securities Act of 1933 must be dismissed because § 17(a) provides no explicit authorization for a private right of action. To allow such, they contend, would contravene the intent of Congress as expressed in the structure of the 1933 and 1934 securities acts and the legislative history that preceded their enactment.

Plaintiffs cite a Fourth Circuit case, *Newman v. Prior,* 518 F.2d 97 (4th Cir. 1975), that arguably allowed a private right of action under § 17(a), however, this has

been effectively abrogated by a 1978 opinion of this same court in *SEC v. American Realty Trust,* 586 F.2d 1001, 1006 (4th Cir. 1978). In any event, the Supreme Court, while apparently recognizing that this is an open question, frowns on the extensive of such a private right of action in the absence of an express authorization thereto. *See, e.g., Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Accordingly, this Court declines to extend a private right of action to Plaintiffs for their claims founded on § 20(a) of the 1934 Act.

■ Both Plaintiffs and Defendants agree that the Plaintiffs' federal and state securities law claims are governed by § 11–703(f) of the Maryland Blue Sky Law. The parties disagree, however, as to the timing involved. Defendants argue that since this action was filed on March 7, 1986, any claim that accrued prior to March 7, 1985, is barred by the one-year statute of limitations applicable to the Blue Sky Law for actions filed under § 11–703(a)(1)(ii) of the statute, as this action was so filed.

Notwithstanding the extensive factual scenario of events as detailed in Plaintiffs' Response to the Defendants' Motion, Plaintiffs contend that they could not have known of the Defendants' alleged misstatements and omissions regarding FCA's financial condition "until April 1, 1985 at the earliest." Other than publication of an FCA newsletter on this date, it is unclear from the record exactly what put them on notice as of that date, as opposed to the date they filed this lawsuit, some 24 days earlier. In any event, the Response contains numerous instances wherein the Plaintiffs note the dissemination of negative information about FCA. *See generally* Plaintiffs' Response at 10, 28, 29.

The record indicates that Plaintiffs were aware of several events that painted an unflattering picture of FCA during the fall of 1984. They were aware that the SEC required FCA to restate its earnings for the first half of 1984, turning a previously reported $75.3 million profit into a $79.9 million loss. Not surprisingly, the stock reacted accordingly, and dropped substantially in the wake of that revelation. Plain-

tiffs were also cognizant of the withdrawal of over $6.8 billion from AS & L, FCA's prime asset, over a six week period from August to October, 1984. In the shadow of the aforementioned developments, FCA commissioned a Task Force of real estate experts to perform an independent review of FCA's loan portfolio and its property holdings. Plaintiffs were also aware of this occurrence.

Plaintiffs allege, however, that they relied on the pronouncements of defendant Popejoy, the newly-installed head of FCA, who apparently assumed office in August 1984 against the specter of an allegedly unscrupulous predecessor (Charles Knapp, not a party to this action). Notwithstanding the presence of new leadership, several management personnel, whom Defendants allege were "key," left FCA. The firm also announced plans for "substantial" reductions in its work force by the end of 1984. Plaintiffs do not dispute Defendants' assertion that they knew of these personnel changes as well.

While it is not uncommon for investors and potential investors to rely on statements by relevant corporate personnel, Mr. Popejoy was hardly their sole source of information. The written record as well as oral argument on this Motion indicates that in late 1984 and early 1985, Plaintiffs, or at least Mr. Ruger, who conducted most of the transactions on behalf of the Plaintiffs, read press accounts of FCA's financial difficulties, including one particularly dire assessment of the company by Mr. Popejoy as reported in the *Wall Street Journal* *("Journal")* of January 31, 1985. In that article, Popejoy warned that FCA would have to "more than double" its $97 million loan loss reserves for the fourth quarter of 1984. Indeed, FCA's accountants revealed approximately one week later that a preliminary loss figure for the year 1984 stood at some $390 million. In any event, § 10(b) does not place on an issuer of stock the duty to disclose figures which neither side in this matter disputes were "trial" in nature.

Assuming *arguendo* that FCA was indeed attempting to deceive the Plaintiffs into believing that FCA's financial prospects were not negative, the quantity of information held by Plaintiffs before March 7, 1985 compels the conclusion that the Plaintiffs were cognizant of such a deception before March 7, 1985. Having reached this conclusion, the Court need not address Plaintiffs' "due diligence" argument. Plaintiffs' claims based on § 11–703 or § 10(b) of the 1934 Act that accrued prior to March 7, 1985 are deemed barred by the applicable statute of limitations.

**■** Defendants maintain that the Plaintiffs' claims against them must be dismissed because the Defendants' alleged misstatements and/or omissions were neither false nor misleading, the Defendants did not withhold material information from the public, and Plaintiffs did not in any event rely to their detriment on any of these alleged misstatements and nondisclosures. The Defendants contend that during the time period relevant to this litigation, they routinely informed the investing public of the company's financial problems, enabling any reasonable investor—and certainly one as skilled as Mr. Ruger (who apparently negotiated most of, if not all, of the transactions for the Plaintiffs)—to draw appropriately negative conclusions regarding FCA's short-term investment potential. The Plaintiffs vigorously dispute these allegations, maintaining that they did indeed rely on statements promulgated by the Defendants, and cite numerous examples of statements that allegedly painted a rosier picture of Defendants' financial health than was actually the case.

In doing so, there has been cited no evidence whatsoever of scienter, proof of which is essential to maintenance of Plaintiffs' claims under the federal securities laws, the state statutory claims, and the claims grounded in common law fraud. As the Court has noted earlier, there has been proffered no evidence—in the pleadings, in oral argument, or otherwise—of any affirmative misrepresentations whatsoever on the part of the Defendants. Nor has there been any showing that Defendants made any false statements or misleading statements with knowledge that they were

false. Plaintiffs' submissions to date on this point consist wholly of unsubstantiated assertions, innuendo, and speculation.

The Supreme Court recently elucidated the test for determining materiality in the § 10(b) and Rule 10b–5 context: "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson,* — U.S. —, —, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988) (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)). Under the *Basic* test, the 'total mix' of information made available about FCA's financial condition over the period at issue depicted a company with a bleak future, at least in the short-term. There is just no dispute as to this finding. It is also quite clear that Plaintiffs were aware of at least some of the information at the time they began investing in FCA, evidenced by, among other things, their own statements expressing a purported belief in Mr. Popejoy's optimistic tone that he espoused upon taking office as chairman in August 1984.

■ Finally, Plaintiffs allege that some of the Defendants have violated provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (1982), founded on alleged violations of federal and state securities laws. More specifically, Plaintiffs have alleged a violation of § 1962(c), which provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The Fourth Circuit, in *United States v. Computer Sciences Corp.,* 689 F.2d 1181, 1190 (4th Cir.1982), *cert. denied,* 459 U.S. 1105, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983), explained that the term "enterprise" was to be an entity differentiated from the person whose behavior RICO was designed to prohibit. In this case, however, the "person" and the "enterprise" are actually one and the same, and do not properly support a claim under the statute. Individual directors and officers of a company cannot be "persons" while the company is deemed the "enterprise" for purposes of establishing the requisite elements of a RICO charge. *Entre Computer Centers, Inc. v. FMG of Kansas City, Inc.,* 819 F.2d 1279, 1287 (4th Cir.1987).

■ Plaintiffs' RICO claim must be dismissed because Plaintiffs have in no way established a "pattern of racketeering activity," as required by 18 U.S.C. §§ 1961(5) and 1962(c). According to § 1961(5), "at least two acts of racketeering activity" are required to constitute a "pattern." The commission of "two or more 'acts' to perpetrate a single fraud," however, does not constitute a "pattern" as required for a violation of the RICO statute. *International Data Bank, Ltd. v. Zepkin,* 812 F.2d 149, 154, 155 (4th Cir.1987). As the basis for fulfilling this requirement, Plaintiffs have alleged a "pattern of false statements and information over an extended period of time." *See* Plaintiffs' Response at 46. It has been noted already that there has been shown no evidence of these alleged fraudulent statements. In any event, these alleged statements amount to nothing more than a single nondisclosure, that is, the alleged withholding of information about FCA's 1984 losses.

Even if Plaintiffs would have succeeded in establishing their remote RICO claim, there would have been no standing, as this Court has already determined that there is no legally cognizable action from the alleged acts of securities fraud which purportedly gave rise to this claim. *See International Data Bank,* 812 F.2d at 151.

On summary judgment, the Court must determine whether: (1) there is any genuine dispute as to material fact, and (2) if there is dispute of fact, whether the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *First National Bank v. Cities Service,* 391 U.S. 253, 288,

88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968); *Morrison v. Nissan Motor Co., Ltd.*, 601 F.2d 139, 141 (4th Cir.1979). The moving party has the burden of showing that there is no dispute as to material fact. *Celotex Corporation v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). He need not, however, negate his opponent's case, he need only disclose the absence of evidence to support that case. *Id.* Once the moving party has met this burden, the nonmoving party must set forth facts indicating a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), *First National Bank v. Cities Service*, 391 U.S. at 288–89, 88 S.Ct. at 1592–93.

In deciding the motion, the Court must view the material facts, and any inferences properly drawn therefrom, in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). The substantive law identifies which facts, or inferences therefrom, are material and also identifies the standard of proof against which the presence or absence of material factual dispute is to be gauged. *Anderson*, 477 U.S. at 248, 254, 255, 106 S.Ct. at 2510, 2513, 2514.

With the above standards in mind, the Court must apply them to the record generated by the parties in this case. The query is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law," not unlike a directed verdict inquiry.

> The mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict ...

*Anderson*, 477 U.S. at 251, 252, 106 S.Ct. at 2511, 2512. Having made this inquiry, the Court concludes that the jurors cannot.

## CONCLUSION

It is important to remember that the interests of both the Plaintiffs and the Defendants must be taken into consideration when considering a motion for summary judgment:

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact ... but also for the rights of persons opposing such claims and defenses to demonstrate ... that the claims and defenses have no factual basis.

*Celotex*, 477 U.S. at 327, 106 S.Ct. at 2555.

The sum total of the evidence proffered in this case, via the pleadings as well as oral argument, depicts a group of investors engaged in some speculative investments that, unfortunately, did not pan out as hoped. This was not an uncommon occurrence during the halcyon days of the securities markets in the mid–1980s. It appears that, among other observations, the Plaintiffs in this case ignored warning signs that were apparent even as they made their initial investments in August 1984.

While it is indeed regrettable that Mr. Popejoy's inaugural optimism did not come to fruition, this Court cannot now allow Plaintiffs' reliance on isolated statements, innuendos, and the like to obnubilate the absence of affirmative misrepresentations, scienter, or other conduct by Defendants that would entitle them to the requested relief in this case. Accordingly, a separate Order will be entered granting summary judgment in favor of the Defendants on all counts of the Complaint.