Elliott TOLAN, et al., Plaintiffs,

v.

COMPUTERVISION CORPORATION, Martin Allen, James R. Berrett, Richard I. Krieger and Philip L. Read, Defendants.

Civ. A. No. 85–1396–H.

United States District Court,
D. Massachusetts.

Oct. 12, 1988.

Glen DeValerio, Berman, DeVerio & Pease, Boston, Mass., Bernard M. Gross,

Jay S. Cohen, Cohen, Milstein & Hausfeld, Washington, D.C., Eugene A. Spector, John F. Innelli, Philadelphia, Pa., Thomas Shapiro, Shapiro & Grace, Boston, Mass., for plaintiffs.

Thomas J. Dougherty, Skadden, Arps, Slate, Meagher and Flom, Boston, Mass., Allan R. Campbell, Bedford, Mass., for defendants.

## MEMORANDUM AND ORDER

HARRINGTON, District Judge.

Plaintiffs object to, and this Court therefore makes a de novo determination of, Magistrate Lawrence Cohen's Report and Recommendation on: Defendants' Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6); Defendants' Motion for Summary Judgment pursuant to Fed.R.Civ.P. 56; and Plaintiffs' Motion for Certification of a Class pursuant to Fed.R.Civ.P. 23.[1]

Plaintiffs Elliott Tolan, Stephen Rosen and Arthur Kalter allege that defendants Computervision Corporation ("Computervision"), Martin Allen, James Berrett, Richard Krieger and Philip Read ("Individual Defendants") engaged in a scheme artificially to inflate the price of Computervision securities by issuing a series of public statements which both misrepresented and omitted material facts. The alleged misrepresentations and omissions concerned Computervision's operations, anticipated operations, earnings, projected earnings, and its ability to maintain growth levels.[2] The plaintiffs seek redress of their alleged consequent injuries and those of a class of traders in Computervision's stock and stock options.

Liability is asserted under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) ("1934 Act"), and Rule 10b–5 promulgated thereunder. *See* 17 C.F.R. § 240.10b–5 (1987). Liability is also asserted under Massachusetts' common law of fraud, deceit, and negligent misrepresentation.[3]

For the reasons stated below, the Court makes the following rulings:

(1) The motion to dismiss the pendent state law claims is denied at this time. Plaintiffs will be required to show *actual* reliance at trial in order to avoid entry of a directed verdict for defendants. Economy and efficiency are not served, however, by dismissing the claims at this early stage, only to encounter delay while the complaint is amended or additional putative plaintiffs are located. These common law claims, moreover, will not significantly expand the scope of discovery.

(2) Defendants' motion to dismiss the claims brought under Section 10(b) and Rule 10b–5 of the 1934 Act is denied.

(3) The motion for class certification is granted as to each of the plaintiffs Tolan, Rosen, and Kalter.

### I. *The Rule 10b–5 Count*

Defendants move to dismiss the Rule 10b–5 claims on the ground that plaintiffs have failed to allege the essential element of reliance. In the alternative, defendants move to dismiss Tolan's and Kalter's Rule 10b–5 claim because they lack standing as options traders to sue under Rule 10b–5. In the alternative, defendants move for summary judgment against Rosen on the ground that he allegedly made a profit on

---

1. The magistrate's jurisdiction is conferred by 28 U.S.C. § 636(b)(1)(B), which sets forth the types of motions a federal district judge may designate for hearing and submission of a recommended disposition. Federal Rule of Civil Procedure 72(b) codifies 28 U.S.C. § 636(b)(1)(B) and provides that any party may file written objections to the proposed findings and recommendations of the magistrate for de novo determination by the referring district judge. *See also* Rule 3(b) of the Rules for United States Magistrates in the United States District Court for the District of Massachusetts.

2. The factual allegations are set forth in more detail in Part II of this Opinion discussing class certification. *See infra* p. 17.

3. Plaintiffs also asserted claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964, which claims have since been dismissed with prejudice by agreement of the parties.

his transactions. The Court considers each argument in turn.

### A. Reliance

■ Reliance is an essential element of a Rule 10b–5 cause of action. *Basic, Inc. v. Levinson,* —— U.S. ——, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988) (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 206, 96 S.Ct. 1375, 1387, 47 L.Ed.2d 668 (1976) (quoting Senate Report)). The reliance requirement ensures that only injuries which result from defendants' material misrepresentation or non-disclosure are compensated. *Id.* (citing *Wilson v. Comtech Telecommunications Corp.,* 648 F.2d 88, 92 (2d Cir.1981); *List v. Fashion Park, Inc.,* 340 F.2d 457, 462 (2d Cir.), *cert. denied sub nom. List v. Lerner,* 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965)).

Magistrate Cohen's Report and Recommendation issued on December 8, 1987. As of that date, neither the United States Court of Appeals for the First Circuit nor the United States Supreme Court had accepted the fraud on the market theory. The Magistrate, however, chose to treat the theory as valid and applied it to the motions before him. Three months later, the Supreme Court validated the fraud on the market theory by ruling that "reliance on any public material misrepresentations.... may be presumed." *Basic,* 108 S.Ct. at 992. The court reasoned that:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business ... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements ... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Id.* 108 S.Ct. at 988–89 (quoting *Peil v. Speiser,* 806 F.2d 1154, 1160–61 (3d Cir. 1986)); *see also Blackie v. Barrack,* 524 F.2d 891, 908 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).

Most investors are unable to compile and evaluate all available material information, but they act under the assumption that this information is reflected in the market price of the corporation's stock and stock options. Thus, the investor who relies on the integrity of a stock's market price shows the necessary causal connection between the misrepresentation and his injury when false or incomplete information have colored the market's perception of the corporation's worth. This approach to the reliance requirement relieves Rule 10b–5 plaintiffs, who have traded on impersonal markets, from the unrealistic evidentiary burden of showing how they would have acted had material misrepresentations not been made or had the omitted material information been disclosed. *See Basic,* 108 S.Ct. at 990, and cases cited therein.

This causal connection is severed, however, if the investor did not trade in reliance on the integrity of the market price or if the market price remained unaffected by the misrepresentations. The presumption of reliance may, therefore, be rebutted by a showing that misrepresentation did not affect market price, or that plaintiffs did not trade in reliance on the integrity of the market price. *Id.* 108 S.Ct. at 992; *see also Cohen v. Laiti,* 98 F.R.D. 581, 583 (E.D.N.Y.1983). Absent this severance of the causal connection, reliance is presumed.

None of the plaintiffs herein claim that they transacted in direct or actual reliance on defendants' public disclosures. Instead, plaintiffs rely on the fraud on the market theory to satisfy the reliance element of their cause of action. Under this theory, plaintiffs need not have read or relied on the defendants' allegedly material misrepresentations. Invocation of the presumption of reliance is sufficient.

Magistrate Cohen found that, assuming validity of the fraud on the market theory, dispute remains as to whether the plaintiffs relied "in fact" upon the integrity of the market. This Court's de novo determination is that the plaintiffs have sufficiently pled the element of reliance by invoking

the doctrine of fraud on the market. Defendants may attempt to rebut the presumption of reliance at trial.

## B. Standing

■ Defendants contend that put and call options traders lack standing to sue under federal securities laws in the absence of allegations that the defendants themselves engaged in options trading. Magistrate Cohen agreed and limited standing to purchasers of common stock. The Magistrate relied primarily on federal district court decisions in *Starkman v. Warner Communications, Inc.*, 671 F.Supp. 297 (S.D.N.Y.1987), and *Deutschman v. Beneficial Corp.*, 668 F.Supp. 358 (D.Del.1985); this latter decision, however, was reversed three months after the Magistrate's Report and Recommendation issued. *See Deutschman v. Beneficial Corp.*, 841 F.2d 502 (3d Cir.1988), *petition for cert. filed.*

Although the 1934 Act defines the term "securities" as including options, *see* 15 U.S.C. § 78c(a)(10), it is unclear whether options traders satisfy the requirement that the fraud be "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Defendants interpret this language as requiring that plaintiffs be purchasers or sellers of the defendants' securities. Since none of the named defendants actually transacted with any of the named plaintiffs, defendants argue, the requisite "connection with the purchase or sale of any security" does not exist.

■ The holder of an option contract has paid a premium for the right, but not the obligation, to buy ("call") or sell ("put") a fixed number of shares of a particular stock at a specified price (called the "exercise" or "striking" price) at any time before the option's expiration date. *See generally*, Rubenstein, *An Economic Evaluation of Organized Option Markets*, 2 J.Comp. Corp.L.Sec.Reg. 49 (1979), *cited in Deutschman v. Beneficial Corp.*, 841 F.2d at 504. Factors to be considered in determining whether Congress intended that option holders have standing under section 10(b) include: the social utility of options trading; the degree to which options trad-

ing affects and is affected by the underlying securities on which the options were written; and, most importantly, the extent to which options traders *rely* on the integrity of the market; or, stated differently, whether the price of an option reflects the judgment of an informed, unmanipulated market. This Court's de novo determination is that the 1934 Act, as initially drafted and later amended, reflects Congress' intent to grant standing to options traders under section 10(b).

Defendants argue that options traders lack standing because: (1) options traders can not state a transactional nexus with issuers of the stock sufficient to satisfy the requirement that the misrepresentation be "in connection with the purchase or sale of securities" when none of the defendants are alleged to have traded in options on the stock of the company; and (2) options traders are speculators whose transactions do not represent contributions of capital to the corporation and therefore should not, as a matter of policy, be protected.

The Court finds these arguments unpersuasive in light of recent decisions expanding the scope of Rule 10b-5's coverage. *See Basic*, 108 S.Ct. 978; *Deutschman*, 841 F.2d 502. *But see Data Controls North, Inc. v. Financial Corp. of America, Inc.*, 688 F.Supp. 1047 (D.Md.1988); *Starkman v. Warner Communications, Inc.*, 671 F.Supp. 297 (S.D.N.Y.1987); *Bianco v. Texas Instruments, Inc.*, 627 F.Supp. 154 (N.D.Ill.1985). The courts in *Deutschman* and *Basic* recognize that the underlying purpose of the 1934 Act is to encourage reliance on the integrity of the market by protecting investors from injury caused by artificial market manipulation. These courts, therefore, interpret the 1934 Act to meet the conditions of the modern securities market. *See Basic*, 108 S.Ct. at 989–90.

In *Deutschman*, the Third Circuit reversed the district court's ruling that purchasers of options contracts lacked standing to sue under section 10(b) for the alleged affirmative misrepresentations of the defendant corporation. The court recognized that the underlying purpose of the

1934 Act is to protect actual participants in the securities market. These participants include options traders. *Deutschman* is the only United States Court of Appeals decision granting Rule 10b–5 standing to options traders, and appears to contrast with the Eighth Circuit's position in *Laventhall v. General Dynamics Corp.*, 704 F.2d 407 (8th Cir.), *cert. denied*, 464 U.S. 846, 104 S.Ct. 150, 78 L.Ed.2d 140 (1983). It bears emphasis, however, that *Laventhall* involved insider trading, a factor which alters the analysis of standing in section 10(b) cases. Insiders are required either to disclose material information or to abstain from trading; if an insider does engage in trading, he must disclose material information. *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Purchasers and sellers of securities, who are not insiders, however, need not disclose material facts, for it is assumed that market participants have equal access to information. Courts have therefore held that in an insider trading case the transactional nexus between the non-disclosure on the part of a defendant and the options market does not exist unless the defendant actually trades in the options market. *See Laventhall*, 704 F.2d at 412; *In re McDonnell Douglas Corp.*, 567 F.Supp. 126, 127 (E.D.Mo.1983). There is a fundamental distinction, however, between liability for not disclosing material information prior to trading by an insider and the broader liability for issuing false and misleading statements because the misrepresenting party can be held liable, even if he did not trade in the security. *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 860 (2d Cir.1968). Although there are situations in which there is no duty to disclose; once disclosures are made, they must not be misleading. *Panter v. Marshall Field & Co.*, 646 F.2d 271, 292 (7th Cir.), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1317 (5th Cir.1977), *cert. denied*, 435 U.S. 952, 98 S.Ct. 1580, 55 L.Ed.2d 802 (1978) ("a duty to speak the full truth arises when a defendant undertakes to say

anything"); *State Tchrs. Retirement Board v. Fluor Corp.*, 500 F.Supp. 278, 299 (S.D.N.Y.1980) (there is a distinction between a company's right to maintain a secret where no statements are issued, and the affirmative obligations that attach under Rule 10b–5 when a corporation makes any kind of statement), *aff'd. in part, rev'd. in part*, 654 F.2d 843 (2d Cir.1981).

In the instant case, plaintiffs have alleged not only failure to disclose material information, but also that defendants made fraudulent misrepresentations which artificially affected the options market. Upon making the alleged fraudulent misrepresentations and material omissions, Computervision and the Individual Defendants incurred potential liability to persons who might suffer pecuniary loss as a result of relying on a market influenced by false and misleading statements. Options traders are among such persons and plaintiffs therefore have standing to sue.

This ruling is not inconsistent with the standing limitation recognized in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), and is consistent with the holdings in *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983), and in *Basic, Inc. v. Levinson, supra*. *Blue Chip Stamps* held that a section 10(b) plaintiff must be a purchaser or seller of a security, and thus limited standing under the 1934 Act to "plaintiffs ... who have at least dealt in the security to which the prospectus, representation, or omission relates." *Id.* 421 U.S. at 747, 95 S.Ct. at 1931. Put and call option trading on an underlying security is directly affected by the prospecti, representations and omissions of the issuer of the underlying security. *See Deutschman*, 841 F.2d at 506. *Cf. Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303 (D.Mass.1987) (holding that sellers of covered calls are not atypical class representatives).

In *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382, 103 S.Ct. 683, 687, 74 L.Ed.2d 548 (1983), the Court held that "a section 10(b) action can be brought by a purchaser or seller of '*any* security'

against 'any' person who has used 'any' manipulative or deceptive device or contrivance in connection with the purchase or sale of a security.'" *Id.* at 382, 103 S.Ct. at 687 (emphasis in original), (*quoting* 15 U.S.C. § 78j, *cited in Deutschman,* 841 F.2d at 505). Put and call option traders fit within this definition of section 10(b) plaintiffs.

*Basic* does not address the issue of option trader standing, but recognizes that a liberal construction of the 1934 Act is necessary to protect the integrity of the *modern* securities market. Discussing the presumption of reliance on the integrity of the market, the Court observed that "[r]ecent empirical studies have tended to confirm Congress' premise that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations. It has been noted that 'it is hard to imagine that there is a buyer or seller who does not rely on market integrity. Who would knowingly roll the dice in a crooked crap game?'" *Basic,* 108 S.Ct. at 991 (quoting *Schlanger v. Four–Phase Systems, Inc.,* 555 F.Supp. 535, 538 (S.D.N.Y. 1982) (footnote omitted)). Just as the trader in the underlying stock relies on market integrity, so too does the options trader. His market strategy may be different, but his reliance on market integrity is the same.

Defendants contend that "[i]t would be ludicrous to subject a company or some of its officers to potential liability for potentially huge losses incurred by put option speculators when put option traders contribute no capital to the company and have no connection with it. Unlike stockholders who contribute equity capital, the company would have a huge potential liability but no corresponding asset." Defendants' Memorandum in Support of Motion to Dismiss the Consolidated Amended Complaint for Failure to State a Claim and for Judgment on the Pleadings at 83 (citing *O'Connor & Assoc. v. Dean Witter Reynolds, Inc.,* 529 F.Supp. 1179, 1185 (S.D.N.Y.1981)). Defendants suggest that because option traders are speculators or gamblers, they are entitled to less protection than traders in the underlying stock, at least where the defendants have not themselves traded in options.

In *Laventhall v. General Dynamics Corp., supra,* relied on by the defendants, the Third Circuit observed that "trading in options can be far more speculative than the purchase of common stock ... Even though the stock price may increase, options may expire worthless. If the option is not exercised ... the buyer may lose its entire purchase price. It is common knowledge that the risk in options trading is enhanced because of the definite and short-lived nature of the contract." *Id.* at 410–411. Not all courts agree, however, that option trading is inherently speculative. In *Deutschman,* however, the Third Circuit viewed option trading in an entirely different light as providing a strategy for investors who want to hedge their losses by reducing exposure to market fluctuations. Studies have shown that option trading may decrease the price-volatility of the underlying securities on which the options are written, and also that the presence of options may increase trading volume of the underlying security, thereby increasing stock liquidity. *See, e.g.,* Hayes, S.L. and Tennenbaum, M. "The Impact of Listed Options on the Underlying Shares," *Financial Management* (Winter 1979). *See also Deutschman,* 841 F.2d at 508; *but see Data Controls North v. Fin. Corp. of America,* 688 F.Supp. 1047 (D.Md.1988).

This Court is not persuaded, therefore, that option trading is inherently speculative; much less is it persuaded that speculativeness alone was intended by Congress to render an investment unworthy of the 1934 Act's protection.

Finally, defendants argue that summary judgment should enter against Rosen because he made a profit. This argument fails for two reasons. First, genuine dispute exists as to whether Rosen actually made a profit during the class period. Second, even if Rosen did make a profit during the class period, he may have been damaged nonetheless as a result of the allegedly disclosures if he thereby lost additional profit. Defendants' motion for summary

judgment against Rosen is therefore denied.

## II. *Class Certification*

█ Plaintiffs Tolan, Rosen and Kalter have moved to certify a class consisting of those who transacted in Computervision's stock and put and/or call options on Computervision stock from December 4, 1984 through April 1, 1985. In his Report and Recommendation of December 8, 1987, Magistrate Cohen recommended that plaintiffs' motion be denied. Upon consideration of the Supreme Court's opinion in *Basic, supra,* and having analyzed plaintiffs' trading activities as they are "enmeshed in the factual and legal issues comprising the plaintiffs' cause of action," *see Coopers & Lybrand v. Livesay,* 437 U.S. 463, 469, 98 S.Ct. 2454, 2458, 57 L.Ed.2d 351 (1978) (quoting *Mercantile Nat. Bank v. Langdeau,* 371 U.S. 555, 558, 83 S.Ct. 520, 522, 9 L.Ed.2d 523 (1963)), it is this Court's de novo determination that the plaintiffs have satisfied the requirements for certification of a class under Fed.R.Civ.P. 23.

To maintain a class action under Rule 23, each of the four requirements of Rule 23(a) must be satisfied, as well as one of the three requirements of Rule 23(b). Thus, there are four conditions for maintenance of a class action under Rule 23(a):

(1) the class must be so numerous that joinder of all members would be impracticable;

(2) there must be questions of law or fact common to the class;

(3) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; and

(4) the representative parties must be able fairly and adequately to protect the interests of the class.

### A. Numerosity and Common Questions of Law and Fact

The Court rules, without discussion, that the proposed class satisfies the numerosity requirement of Rule 23(a)(1) and that there are common questions of law and fact as required by Rule 23(a)(2).

### B. Rule 23(b)

Rule 23(b) requires that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action [be] superior to other available methods for fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). The class proponent has the burden of satisfying all the prerequisites of Rule 23(a) and the relevant Rule 23(b) requirement. The Court finds that common questions of law or fact predominate over questions affecting individual members of the proposed class, thus satisfying Rule 23(b)(3).

### C. Typicality

█ Defendants contend that plaintiffs are atypical because their injuries were not caused by reliance on the integrity of the market, but rather were caused by the plaintiffs' unique trading strategies.

Analysis under the typicality prerequisite involves a comparison of the claims of the putative plaintiffs with the claims of the class. The named plaintiffs' claims are typical of the class when the plaintiffs' injuries arise from the same events, practice or course of conduct of the defendant as do the injuries which form the basis of the class claims. Factual variations between the claims of the class and the class representatives do not, alone, render the named representatives' claims atypical. *See generally,* 7 Wright & Miller, Federal Practice & Procedure Civil: § 1763 at 605 n. 91. Therefore, the Court must determine whether both the named plaintiffs' injuries and the injuries of the class resulted from reliance on the integrity of the market price of Computervision stock.

Rule 23(a)(3) which requires a finding that the claims of the class representatives are typical of the proposed class and Rule 23(a)(4) requiring a finding that the representative parties must be able to fairly and adequately protect the interests of the class, compel the Court to analyze the factual basis of the putative plaintiffs' claims and measure their claims against the requirements of class certification.

In December of 1984, Computervision issued a prospectus for the sale of $100 million in convertible debentures. In this prospectus, Computervision announced a change in marketing strategy and the introduction of new products. Thereafter, through a report to Standard & Poor's, in announcements made in December, 1984 and January, 1985; in a report in Business Wire, Inc., on February 11, 1985; and in the Annual Report, dated March 6, 1985, defendants projected that revenues and earnings for 1985 would increase over those for 1984 and that Computervision would grow at a rapid pace. Defendants also stated that its new marketing strategy was successful.

On March 13, this news changed. Computervision announced that demand for its products was sluggish, that it had experienced a loss of market share, and that it would only break even for the first quarter of 1985 because revenue increases had been smaller than expected. Computervision's announcement concluded with the statement that it still hoped to grow by thirty to forty percent in 1985. Computervision stock dropped about ten dollars a share on the next trading day.

On April 1, 1985, Computervision announced that it would report operating losses for the first quarter of 1985. The price of Computervision stock then dropped further.

As discussed *supra* at 773–74, the Supreme Court's decision in *Basic, Inc. v. Levinson*, — U.S. —, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), holds that fraud on the market is an established and accepted theory of recovery under the federal securities law.

The rebuttable presumption of reliance, as the Court in *Basic* recognized and intended, impacts on the issue of whether to certify a class in federal securities law cases:

Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones. The District Court found that the presumption of reliance created by the fraud-on-the-market theory provided a practical resolution to the problem of balancing the substantive requirement of proof of reliance in securities cases against the procedural requisites of [Fed. R.Civ.P.] 23.

*Id.* 108 S.Ct. at 989.

Typicality is established by a showing that the putative plaintiffs relied on the integrity of the market. A court need not consider the merits of the putative plaintiffs' claims in order to determine whether a class should be certified.[4]  *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974); *Shores v. Sklar*, 844 F.2d 1485, 1491, *reh'g. granted* (en banc) *vacated*, 855 F.2d 722 (11th Cir.1988) (rehearing scheduled for week of October 17, 1988). "[I]f plaintiffs employ a fraud on the market theory, individual issues of reliance virtually disappear." *Id.* at 1494 (citing *Ross v. Bank South N.A.*, 837 F.2d 980, 994 (11th Cir. 1988)) (quoting *Dekro v. Stern Bros. & Co.*, 540 F.Supp. 406, 417 (W.D.Mo.1982)).

Plaintiffs Tolan, Rosen and Kalter can meet the typicality requirement of Fed.R. Civ.P. 23 if they relied on the integrity of the market to determine the price and value of the securities in which they traded. The issue is not whether a broker was the source of the information upon which plaintiffs relied; *see Grossman v. Waste Management, Inc.*, 589 F.Supp. 395 (N.D. Ill.1984); *Biben v. Card*, Fed.Sec.L.Reptr. p. 92,462, 1986 W.L. 199 at 12 (W.D.Mo. 1986) ("[r]eliance on the advice of third parties who serve simply as conduits of the defendants' misrepresentations and omissions does not make class certification less appropriate"); it is not whether the plaintiffs' investment strategy is similar to that of the class; *see Kirby v. Cullinet Software, Inc.*, 116 F.R.D. 303 (D.Mass.1987)

---

**4.** The plaintiffs, however, must provide more than bare allegations that they satisfy the requirements of Fed.R.Civ.P. 23. *See e.g., Morri-* *son v. Booth*, 763 F.2d 1366, 1371 (11th Cir. 1985). Plaintiffs have more than satisfied that burden in the instant case.

(investment strategy of little importance to suitability as class representatives); it is not the time at which one purchased their security or how long they held the security; *In re Endotronics,* Fed.Sec.L.Reptr. 93,-664, 1988 W.L. 9250 (D.Minn.1988) (in and out traders just as much members of investment class in terms of reliance as long term investors) and it is not the type of security in which an investor trades. *Cf. Deutschman,* 841 F.2d at 508 (option holders have standing to sue for affirmative misrepresentation under section 10(b) of the 1934 Act). It is not the manner in which plaintiffs relied that is the issue, but whether they *in fact* relied on the integrity of the market. "[T]here are different types of reliance in almost every securities class action and to deny certification where a factual difference in reliance arises would render the class action device nugatory in securities fraud cases." *Gorsey v. I.M. Simon & Co., Inc.,* 121 F.R.D. 135 (D.Mass.1988).

Defendants argue that Tolan pursued a unique speculative options strategy during the class period which subjects him to arguable defenses which render his claim atypical. They argue that this strategy had nothing to do with Computervision's public statements.

The Magistrate's report found that Tolan relied on his broker Timothy Cutler ("Cutler"), to devise and manage a trading strategy for him. Cutler relied on a market forecasting technique which was directed, in part, toward anticipating price declines. Tolan's options strategy, as directed by Cutler, was based on weighing the stock prices of eight companies, on which he wrote put and call options, to obtain a mix of volatility. Cutler then extrapolated his unique forecasts from past short-term stock price movements. *See* Report and Recommendation on Class Certification at 5.

On February 5, 1985, Tolan purchased 300 shares of Computervision stock and sold 3 May 35 calls. Tolan's next transaction was on March 4, 1985. Tolan covered the option portion of his transaction by buying three calls, while still retaining 300 shares of Computervision. Then, also on March 4, 1985, Tolan sold three May puts. The price of Computervision then dropped significantly. On March 13, 1985, Tolan had to purchase an additional 300 shares of Computervision upon the exercise of the put options he had sold.

Defendants claim Rosen is atypical because he allegedly profited from his investments in Computervision stock; 'he never read or relied on Computervision documents challenged in the complaint in making his investment decisions; his purchase of 100 shares on December 12, 1984 was influenced by performance of stocks in general over the prior two days, and computer and electronics stock over the prior day; and, most importantly, he continued to purchase stock after the price was falling and even after Computervision's March 13 announcement that it was experiencing sluggish demand for its products and expected to about break even for the quarter. Thus, defendants argue, that Rosen's unique strategy of "turnaround buying" in response to perceived market overreaction also subjects him to unique defenses.

Defendants argue that Kalter was an options speculator who would have traded regardless of whether he knew the information allegedly not disclosed. Defendants contend that Kalter is vulnerable to the unique defense that rather than relying on a belief that the high value of the stock reflected a healthy investment, he relied on a feeling that the stock had bottomed-out and was due for an upturn. Kalter's only transaction during the class period was the sale of 5 puts on March 14, 1985, the day after defendants' announcement disclosing a portion of Computervision's financial problems.

The Court finds that Tolan, Rosen and Kalter have raised claims in their amended complaints that are typical of the class they seek to represent. Traders in puts and calls rely on the integrity of information disseminated in the market just as do the purchasers and sellers of the underlying securities. Tolan may have anticipated a temporary price decline, and Rosen and Kalter may have thought the price of Com-

putervision stock had bottomed-out, but all three made their investment decisions in reliance on the integrity of the market price of Computervision stock. It is of no consequence that the putative plaintiffs devised different investment strategies as a consequence of their reliance.

If the plaintiffs relied on the price of Computervision stock to reflect accurately information disseminated in the market, they were injured if Computervision made fraudulent misrepresentations and omissions of material fact. The plaintiffs' investment activity would have been affected had they known of Computervision's financial and competitive difficulties. If Rosen and Kalter had known on March 13, 1985 that on April 1, 1985 Computervision would announce that it would report an operating loss for the first quarter of 1985, they would have traded differently. Kalter may not have sold puts since puts are usually exercised when the price of stock declines and Rosen may not have felt that the stock had bottomed-out. In short, the putative plaintiffs allege that they were injured as a result of Computervision's statements and omissions. The injuries of the class which the putative plaintiffs seek to represent arise from this same conduct. The plaintiffs claims, therefore, are typical of the class.

### D. Adequacy

■ Defendants argue that issues of credibility affect plaintiffs' ability to adequately represent the class. The Magistrate found that the plaintiffs' lack of credibility, when added to their unfamiliarity with this action, tipped the balance in favor of a finding them inadequate class representatives.

Under the adequacy of representation requirement of Rule 23(a)(4), the class may be certified if "the representative parties will fairly and adequately protect the interests of the class." Adequacy of representation depends on two factors: (1) the plaintiffs' attorneys must be qualified, experienced and generally able to conduct the litigation, and (2) the plaintiff must not have interests antagonistic to that of the class. *See Andrews v. Bechtel Power Corp.*, 780 F.2d 124 (1st Cir.1985), *cert.*

*denied*, 476 U.S. 1172, 106 S.Ct. 2896, 90 L.Ed.2d 983 (1986).

This Court is convinced that plaintiffs' counsel will vigorously represent the class and that they are so qualified. The issue then remains whether the putative plaintiffs' credibility problems suggest a potential conflict between the named plaintiffs and the class they seek to represent. *See Kronfeld v. Trans. World Airlines, Inc.*, 104 F.R.D. 50 (S.D.N.Y.1984).

The Court finds that none of the credibility questions raised by the defendants impact on putative plaintiffs' adequacy to represent the class. The putative plaintiffs' interests are not antagonistic or in conflict with the class they seek to represent. At trial, defendants may properly inquire into plaintiffs' purported credibility problems. The plaintiffs' credibility, however, will not unduly burden the class, nor will it divert attention from the substance of the class claim. As a result of the Supreme Court's decision in *Basic, Inc.*, individual recollections of plaintiffs with respect to the particular information they relied on and their memory of certain events is of minimal import if the plaintiffs are able to show that they relied on the integrity of the market in making their investment decision. This Court so finds.

For the reasons stated above, it is ORDERED:

1. Tolan, Kalter and Rosen are certified to represent the proposed class.

2. Defendants' motion to dismiss plaintiffs' claim under Section 10b of the 1934 Act is DENIED.

3. Defendants' motion to dismiss plaintiffs' claim of common law fraud and deceit is DENIED.

4. Defendants' motion to dismiss plaintiffs' claim of negligent misrepresentation is DENIED.

5. Plaintiffs' claim under the Racketeer Influenced and Corrupt Organizations Act is DISMISSED with prejudice.