**In re BANK OF BOSTON CORPORA-
TION SECURITIES LITIGATION.**

No. 89–2269–H.

United States District Court,
D. Massachusetts.

May 1, 1991.

**1528**

Glen DeValerio, Berman, DeValerio and Pease, Thomas G. Shapiro, Shapiro, Grace & Haber, Boston, Mass., Stuart H. Savett, Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa., for plaintiff.

Gerald F. Rath, Bingham, Dana & Gould, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

HARRINGTON, District Judge.

Plaintiffs in this action are all shareholders or purchasers of stock in the Bank of Boston Corporation (the "Bank"). Plaintiffs assert that, during the period October 20, 1988 through January 3, 1990, the Bank, through its officers and directors, published materially false and misleading information concerning the Bank's financial condition and its projected profitability in a scheme to manipulate the market price of the Bank's securities. Because the plaintiffs purchased Bank stock during that period, allegedly at an artificially high price, they contend that they suffered substantial losses as a result of the Bank's conduct. Plaintiffs filed suit against the Bank, charging violations of both the federal securities laws and state common law.

The case is now before this Court on both the Plaintiffs' Motion for Class Certification and the Defendant's Motion for Partial Summary Judgment.

## FACTUAL BACKGROUND

*General Background*

Plaintiffs' Amended Consolidated Class Action Complaint (the "Complaint") seeks recovery on behalf of three classes of individuals, including persons who purchased Bank stock on the open market, those who purchased stock through an automatic dividend reinvestment plan, and those who acquired stock as a result of a merger agreement. The Complaint asserts five bases of recovery.[1] All plaintiffs charge that the Bank violated Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and that it committed negligent misrepresentation and common law fraud by knowingly and/or recklessly making false and misleading statements regarding the Bank's policies and financial condition. (Complaint, ¶¶ 76–83, 105–115). In addition, certain of the plaintiffs charge that the Bank violated Section 11 and Section 12(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77*l*, by issuing two prospectuses that contained false or misleading information. (Complaint, ¶¶ 88–99).

The events which form the basis of plaintiffs' claims fall into two categories: (1) those relating to disclosures made by the Bank regarding its policies and financial condition during the relevant period; and (2) those relating to a merger between the Bank and the BankVermont Corporation ("BankVermont"). The relevant facts concerning each of the categories of events are summarized below.

### 1. The Bank's Financial Condition

The Defendant Bank is a multi-bank holding company incorporated in the Commonwealth of Massachusetts, and it is the

---

1. By stipulation of the parties, the individual defendants were dismissed from this action. (*See* Stipulation, Tolling and Discovery Agreement, dated May 8, 1990). As a result, plaintiffs' claims against those defendants—claims arising under Section 20(a) of the Securities and Exchange Act of 1934 and under Section 15 of the Securities Act of 1933—are also dismissed. Thus, only five of the seven counts in plaintiffs' Complaint remain.

largest bank holding company in the New England area. The Bank provides a variety of financial services, including domestic, corporate, and investment banking services, investment and fund management services, personal banking and trust services, banking operations and corporate services, and commercial real estate lending and mortgage services. Though in 1988 the Bank was considered a preeminent regional institution and, perhaps, a growing "superregional" institution, it, like many other banks in the region, has suffered in the wake of New England's economic downturn.

Specifically, on October 20, 1988, the Bank reported third quarter profits of $79 million, which exceeded profits for the same period during the previous year by $5 million. A press release issued by the Bank indicated that the profits reflected lower credit losses, strong interest income, and higher profits from venture capital operations. On January 19, 1989, the Bank announced another increase in earnings: fourth quarter earnings for 1988 were $83 million compared to a $41 million loss in the preceding fourth quarter. In February, 1989 the Bank released its Annual Report to Shareholders for 1988, reporting record net income for the year. Throughout this period the Bank was pleased with its performance and optimistic that it would not experience problems with its New England real estate holdings. The Bank stated that it was focusing on conservative financing and lending strategies and that it was monitoring its real estate portfolio.

Reported earnings in 1989 continued to reflect growth and financial stability. First quarter earnings for 1989, reported on April 13, 1989, showed slight improvement over 1988, while second quarter earnings, reported on July 20, 1989, increased more than $20 million over 1988. Press releases issued during this period again acknowledged the Bank's satisfaction with its financial performance as well as its intention to persist in controlling its real estate portfolio and nonperforming assets.

On October 2, 1989, however, the Bank disclosed sharply deteriorating operating results. The Bank stated that it would add $370 million to its loan loss reserves to cover problems associated with the declining real estate market and with a large, highly leveraged, non-performing loan. The Bank indicated that this addition to reserves would lead to a significant third quarter loss. In addition, the Bank anticipated that it would add $45 million to reserves for the fourth quarter. On January 2, 1990, the Bank disclosed that additions to loan loss reserves in the fourth quarter actually totalled $280 million—$235 million more than originally estimated. In the wake of these disclosures, the value of Bank stock dropped approximately thirty percent, from 26⅝ in October, 1989 to 18¾ in January, 1990.

2. The Merger with BankVermont

In December, 1987 the Bank entered into an Acquisition Agreement with BankVermont which provided for the merger of the two institutions. According to the terms of the merger, upon consummation of the transaction, BankVermont shareholders would receive both cash and Bank stock in exchange for their BankVermont shares. In connection with this acquisition, the Bank filed a Form S–4 Registration Statement on March 11, 1988, and it filed an amendment thereto on April 8, 1988. In addition, the Bank and BankVermont filed a Prospectus and proxy statement with the Securities and Exchange Commission ("SEC") on April 11, 1988. On May 23, 1988 BankVermont shareholders voted to approve the acquisition, subject to regulatory approval. After receiving approval, the Bank consummated the merger. The Bank then formally announced the merger in a December 30, 1988 press release. When the actual stock exchange occurred on January 3, 1989, BankVermont shareholders received $1.12 in cash and 0.976 of a share of Bank stock in exchange for their BankVermont stock.

CLASS CERTIFICATION

Though the decision to certify a class is an initial determination that must be made without inquiry into the merits of the plaintiffs' claims, *Eisen v. Carlisle & Jacque-*

*lin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974), the decision nevertheless must be based upon a "rigorous analysis" of the particular facts of the case, *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372–73, 72 L.Ed.2d 740 (1982). The court must be satisfied that plaintiffs have met all the requirements for class certification under Rule 23. In particular, the court must find that:

1. the class is so numerous that joinder of all members would be impracticable;

2. there are questions of law and fact common to the class;

3. the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

4. the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Additionally, in most class actions under the securities laws, the court must conclude that common questions of law and fact predominate over any questions affecting individual class members, and that a class action would be superior to other methods for adjudicating the controversy. Fed.R.Civ.P. 23(b)(3). The burden of proving all of the requirements for class certification under Rule 23 rests entirely on the named plaintiffs. *Grace v. Perception Technology Corp.,* 128 F.R.D. 165, 167 (D.Mass.1989).

### The Proposed Classes

In this case, plaintiffs seek certification of three classes: (1) the "Main Class," [2] consisting of all persons who purchased common stock of the Bank on the open market during the period October 20, 1988 through January 3, 1990 (the "Class Period") and who were damaged thereby; [3] (2) the "Reinvestment Class," consisting of all persons who purchased Bank common stock during the Class Period, pursuant to the Bank's Automatic Dividend Reinvestment and Common Stock Purchase Plan (the "Reinvestment Plan"); and (3) the "Acquisition Class," consisting of all persons who acquired Bank common stock pursuant to the acquisition by the Bank of BankVermont. Excluded from the classes are the Bank, its officers and directors,[4] members of their immediate families, and any subsidiary, affiliate or controlled person of any such person or entity.

Plaintiffs propose that three individuals serve as the named representatives of the Main Class: (1) Richard Rosenberg, as a trustee for the Circle Packaging Corp. Pension Trust, which purchased stock on the open market; (2) Donald Pate, who purchased stock through the Bank's Reinvestment Plan; and (3) Alcan Levy, who acquired Bank stock pursuant to the acquisition of BankVermont. In addition, plaintiffs propose that Pate and Levy also serve as sole representatives of the Reinvestment Class and the Acquisition Class, respectively.

### Analysis

At the outset, the Court notes that certain of the requirements of Rule 23 are not at issue in this case. Defendant does not contest that plaintiffs have met the requirements of "numerosity" and "commonality" under 23(a). In addition, this Court rules, without discussion, that the plaintiffs

---

**2.** Though plaintiffs referred to this group of purchasers as "The Class," this Court has selected the term "Main Class" for purposes of clarity.

**3.** Plaintiffs sought also to include in this class those persons who purchased stock pursuant to the Bank's Automatic Dividend Reinvestment and Common Stock Purchase Plan and those who acquired Bank shares in exchange for BankVermont stock. (Complaint, ¶ 20). Strictly speaking, those persons are *not* "open market purchasers," and they should not be considered as such. In addition, those persons are represented in the two proposed subclasses, and those subclasses raise claims identical to those of the Main Class. (*See* Complaint ¶¶ 82–83, 106, 110, asserting claims for relief on behalf of all three classes, collectively). Thus, the Court will not include them here. All references herein to the Main Class pertain solely to open market purchasers.

**4.** Plaintiffs' Complaint simply excludes "the defendants herein." (Complaint, ¶ 20). However, because the individual defendants, who were all officers and directors of the Bank, have been dismissed as defendants in the case, the Court finds it appropriate to exclude them explicitly from the classes.

have made a sufficient showing under 23(b) to satisfy the requirements of 23(b)(3). Thus, the only class certification issues to be resolved by this Court relate to "typicality" and "adequacy of representation." Before this Court can address those certification issues, however, it must answer a threshold question: Do each of the named plaintiff representatives have *standing* to assert the claims for which each class seeks to recover?

### 1. Standing

■■■ A federal district court may not permit a plaintiff to circumvent the standing requirement simply because the plaintiff files his suit as a class action. *See Brown v. Sibley*, 650 F.2d 760, 771 (5th Cir.1981) ("Standing cannot be acquired through the back door of a class action."). Thus, when the issue of standing is raised by a party, the Court must resolve that issue *before* considering the class certification requirements under Rule 23. *Adair v. Sorenson*, 134 F.R.D. 13, 16 n. 3 (D.Mass. 1991) (citation omitted). Indeed, standing "is the threshold issue in every federal case," *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975), because the resolution of the standing issue bears directly on the constitutional power of this Court to decide the controversy at all. In the class action context, moreover, the standing requirement properly ensures that the court's remedial powers are invoked, not for the resolution of abstract public controversies, but for the protection of individual rights. *See id.* at 500, 95 S.Ct. at 2205–06.

■■ Strict standing requirements are particularly important in the area of securities litigation, in order to curb the risks of vexatious litigation and abuse of discovery. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 739–41, 95 S.Ct. 1917, 1927–28, 44 L.Ed.2d 539 (1975) (discussing dangers associated with Rule 10b–5 litigation). Courts, therefore, have addressed the standing question in numerous securities class actions and have dismissed cases where the proposed class representatives lacked individual standing to pursue their claims. *See, e.g., Boyle v. Merrimack Bancorp, Inc.*, 756 F.Supp. 55, 61–62 (D.Mass.1991) (dismissing Section 10(b) claim); *Konstantinakos v. Federal Deposit Ins. Corp.*, 719 F.Supp. 35, 38 (D.Mass. 1989) (same); *Gabrielsen v. BancTexas Group, Inc.*, 675 F.Supp. 367, 374 (N.D. Tex.1987) (dismissing Section 14(a) claim); *Kirkwood v. Taylor*, 590 F.Supp. 1375, 1383 (D.Minn.1984) (granting summary judgment on Section 11 claim); *see also Brown*, 650 F.2d at 771 (noting that, where the court determines that a named plaintiff lacks standing, "proper procedure [in a single-claim class action] is to dismiss the complaint rather than to deny the class for inadequate representation or to allow other class representatives to step forward"). Moreover, even where a named class representative may properly pursue a claim, courts have strictly limited the class period to the period for which that named representative has standing. *See, e.g., Adair*, 134 F.R.D. at 16–17; *In re General Motors Class E Stock Buyout Secur. Litigation*, 694 F.Supp. 1119, 1126–27 (D.Del.1988).

■■ In this case, the issue of standing primarily affects plaintiffs' claim under Section 10(b) and Rule 10b–5.[5] In order to maintain a private action under Section 10(b), a plaintiff must be an actual purchaser or seller of securities who sustained a loss as a result of the alleged misrepresentations by the defendant. *See Blue Chip Stamps*, 421 U.S. at 737–38, 95 S.Ct. at 1926–27. Thus, a plaintiff has standing to sue under Section 10(b) only if that plaintiff, in fact, engaged in a transaction for the purchase or sale of securities. Here, plaintiff Levy cannot meet this requirement. Levy held stock in BankVermont, and he acquired Bank stock through an

---

**5.** There seems to be no question that the named plaintiffs for the Reinvestment Class and the Acquisition Class purchased Bank stock pursuant to the relevant prospectuses and registration statements. Thus, plaintiffs Pate and Levy are assumed to have standing to sue under Section 11 and Section 12(2). *Cf. Kirkwood*, 590 F.Supp. at 1383–87 (holding that plaintiffs lacked standing because they were unable to "trace" their stock purchase to a particular prospectus).

exchange offer that was part of a merger agreement between BankVermont and the Bank. Any financial harm he may have suffered at the time of the exchange was the consequence of his decision to *retain* his BankVermont stock rather than to sell it or to exercise his appraisal rights. The decision *not to sell,* however, is not actionable under Section 10(b). *Id.* Thus, plaintiff Levy has no standing to bring a claim under Section 10(b).

Though there is no question that plaintiffs Pate and Rosenberg actually purchased Bank stock during the Class Period, they are subject to scrutiny with respect to a second aspect of the standing requirement. Specifically, a Section 10(b) plaintiff has standing to challenge only those alleged misrepresentations upon which he reasonably relied in purchasing or selling his stock. Stated differently, a plaintiff has standing to challenge only those events occurring *prior to* the date of his last purchase or sale; for it is impossible for a plaintiff to have been misled by events occurring afterward. *Adair,* at 16; *see also Konstantinakos,* 719 F.Supp. at 37–38. Since plaintiff Pate apparently has continued to purchase Bank stock through the present time, he has standing to sue under Section 10(b) for all alleged misrepresentations throughout the Class Period. Plaintiff Rosenberg, however, has standing to sue only for those misrepresentations made during the class period and prior to his last purchase on May 9, 1989.

The precise limits of any Section 10(b) "class claims" in this case, however, will depend on which of the named plaintiffs become *certified* to represent a class on this claim. *See Warth v. Seldin,* 422 U.S. at 502, 95 S.Ct. at 2207 (holding that standing of the class is based upon the standing of the named plaintiff representative). Therefore, the Court will examine each of the proposed classes and the proposed representatives to ascertain whether any or all of the classes may be certified.

### 2. Class Certification: Typicality and Adequacy

#### A. *Typicality*

Rule 23(a)(3) requires that the claims and defenses of the class representatives be "typical" of the claims and defenses of the class. To be considered typical, a named plaintiff need not show "substantial identity" between his claims and those of the absent class members, *see Randle v. Spectran,* 129 F.R.D. 386, 391 (D.Mass.1988) (citation omitted). The claims of a named plaintiff are considered to be typical of the class when the plaintiff's injuries arise from the same events or course of conduct as do the injuries that form the basis of the class claims, *Tolan v. Computervision Corp.,* 696 F.Supp. 771, 777 (D.Mass.1988), and when the plaintiff's claims and those of the class are based on the same legal theory, *Dura–Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 99 (S.D.N.Y.1981). Nonetheless, the court must conclude that in advancing his own interests, the named plaintiff will advance the interest of the class. *Id.* In particular, where a named plaintiff may be subject to unique defenses that would divert attention from the common claims of the class, that plaintiff cannot be considered typical of the class. *Perception Technology,* 128 F.R.D. at 169.

Here, there can be little dispute that Rosenberg is a typical representative of the members of the Main Class. In defendant's own words, Rosenberg, as Trustee of Circle Packaging Pension Trust, is the "only true open market purchaser." The alleged course of conduct which caused injury to Rosenberg is virtually identical to that which allegedly injured the absent class members. There are no unique circumstances surrounding Rosenberg's purchases of Bank stock which would render his claims atypical of the Main Class. The defendant, in fact, does not contest Rosenberg's typicality.[6]

However, the defendant Bank does contest the typicality of Plaintiffs Pate and

**6.** At the hearing, the defendant instead focused his argument on Plaintiff Rosenberg's adequacy as a class representative. This issue is discussed in detail in Part B below.

Levy, asserting that both these individuals are subject to unique defenses—in particular, certain unique reliance defenses—which disqualify them as typical representatives of the proposed classes. Though the Court is persuaded by the defendant's arguments with respect to the Main Class, both plaintiffs appear to be typical representatives of their respective subclasses.

As a participant in the Bank's Reinvestment Plan, Pate allegedly was injured because he chose to reinvest his dividends in Bank stock on the assumption that the value of that stock fairly reflected its market price. Plaintiffs contend that the same course of conduct injured Plaintiff Pate and the absent members of the Main Class alike, because he, like the open market purchasers, was a victim of a fraud on the market by the defendant. In this Court's view, however, Pate is atypical of the Main Class. Pate's deposition testimony[7] indicates that he joined the Bank's Reinvestment Plan in 1987, prior to any of the events complained of in this case, and that he continues to participate in it to this day. He states that he participates in the Reinvestment Plan, in part, out of convenience to avoid dealing with small dividend checks and, in part, for personal reasons as a means of financing his daughter's college education. In light of these facts, the Court is not entirely convinced that the fraud on the market theory advanced by the Main Class is appropriate with respect to Pate's claims, because Pate's reinvestment decisions may be based on factors wholly unrelated to the price of Bank stock. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 251–52, 108 S.Ct. 978, 993–94, 99 L.Ed.2d 194 (1988) (White, J., concurring in part, dissenting in part) (noting that the majority opinion "puts to rest the prospect of recovery" where plaintiff buys stock "for reasons unrelated to its price"). The Court will not make a final determination as to the applicability of this legal theory at this time, however.

At the least, this Court recognizes that Pate's inclusion in the Main Class could well give rise to reliance defenses that are *substantively* different from those which could be used to challenge open market purchasers. Unlike the members of the Main Class who made a conscious decision to invest in Bank stock and who may be presumed to have relied on the market in doing so, *Basic,* 485 U.S. at 245, 108 S.Ct. at 990, Pate was a mere *passive* investor, who, in fact, may *not* have relied on the integrity of the market at all. *See generally id.* at 246–50, 108 S.Ct. at 991–93 (indicating that the presumption of reliance may be rebutted where plaintiffs did not rely on the market); *Tolan,* 696 F.Supp. at 779 (indicating that the proper inquiry in a securities class action is "whether [plaintiffs] *in fact* relied on the integrity of the market"). As the defendant points out, these unique reliance defenses may detract from the class members' case. Particularly where the Main Class is to be represented by only a few plaintiffs, the atypicality of Pate may have a significant impact on the class. *Cf. In re Lilco Secur. Litigation,* 111 F.R.D. 663, 673 (E.D.N.Y.1986) (finding atypicality of one representative to be minimized where class would be represented by fourteen plaintiffs). The unique reliance questions raised by Pate's Reinvestment Plan purchases, therefore, render him atypical of members of the Main Class.[8]

---

7. In some cases, inquiry into deposition testimony may "[extend] beyond the scope of class certification and into the merits of the litigation." *Priest v. Zayre Corp.,* 118 F.R.D. 552, 554 (D.Mass.1988). In this case, however, Pate's testimony is especially relevant, at this stage, to the question of whether all subclasses of purchasers are proceeding, in fact, on the same legal theory. The Court, therefore, will rely on the deposition testimony insofar as it highlights certain general characteristics of Reinvestment Plan participants.

8. The Court is aware of cases in which Reinvestment Plan participants have been found to be typical representatives for a class of open market purchasers. *See, e.g., In re VMS Secur. Litigation,* 136 F.R.D. 466, —— (N.D.Ill.1991); *In re Lilco Secur. Litigation,* 111 F.R.D. at 673–74; *In re Consumers Power Co. Secur. Litigation,* 105 F.R.D. 583, 602–04 (E.D.Mich.1985). However, in none of those cases did the court confront the reliance issues raised in this case.

■ Similarly, the potential for unique defenses defeats Plaintiff Levy's typicality as a representative of the Main Class.[9] Levy, as a person who merely acquired Bank stock in exchange for BankVermont stock, gained information regarding the Bank primarily, if not entirely, from the Prospectus and Registration Statement issued in connection with the BankVermont merger and distributed to him in May, 1988, at least six months prior to the start of the Class Period. Indeed, during the proposed Class Period, Levy may not have seen or relied on available market information regarding the Bank at all. Thus, Levy may be unable to proceed on either a theory of direct reliance or the fraud on the market theory advanced by the plaintiffs in this case. Regardless, even if Levy can establish that certain market information came to his attention after the BankVermont shareholders approved the merger in May, 1988, but before the stock exchange actually occurred in January, 1989, Levy can claim only that this information induced him to *inaction* rather than action; that is, that Levy was induced merely to retain his shares until the time for exchange arrived rather than to purchase or sell Bank stock. In this Court's view, the inherent difficulty of proving both inaction and injury flowing therefrom poses a unique obstacle to Levy's recovery that the Main Class should not confront. By virtue of his unique susceptibility to challenge, therefore, Levy cannot be considered typical of the Main Class.

■ Though atypical of the Main Class, Plaintiffs Pate and Levy are typical of their respective subclasses. In this Court's view, any defenses which may be used against Pate and Levy are likely to apply with equal force against all members of the proposed subclasses. Thus, this Court finds Pate to be typical of the Reinvestment Class and Levy to be typical of the Acquisition Class. *Cf. In re VMS Secur. Litigation*, 1991 US Dist. LEXIS 3960, at 18, —— F.R.D. ——, —— (N.D.Ill.1991) (finding that purchasers through an initial

public offering would proceed on a "different reliance theory" from open market purchasers and, thus, that they should be certified as a separate subclass).

## B. *Adequacy of Representation*

■ Two basic elements guide the Court's interpretation of the "adequacy of representation" requirement. The Court must determine, first, whether any potential conflicts exist between the named plaintiffs and the prospective class members and, second, whether the named plaintiffs and their counsel will prosecute the case vigorously. *See Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985); *Backman v. Polaroid Corporation, et al.*, No. 79–1031–Mc, slip op. at 4 (D.Mass. July 16, 1982). With respect to the second element, this Court is convinced that plaintiffs' counsel are well qualified to prosecute the case and that they will vigorously do so. The Court is also convinced, despite defendant's arguments to the contrary, that plaintiffs themselves possess sufficient familiarity with the litigation to ensure that they, too, will vigorously pursue the claims. Therefore, the Court need only inquire whether any potential conflicts exist between the named plaintiffs and the members of the proposed classes.

■ The defendant challenges Plaintiff Rosenberg on the issue of potential conflict, arguing that Rosenberg's fiduciary obligations as a trustee conflict with his obligations as a class representative. Because a trustee of a pension plan is prohibited by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, from exposing pension plan assets to liability for the benefit of anyone other than beneficiaries of the plan, the defendant contends that Rosenberg cannot fulfill the financial obligations of class representation. The ability to fulfill these financial obligations, the defendant argues, is an essential characteristic of an adequate representative.

---

**9.** Though the Court has already determined that Levy lacks standing to bring a claim under Section 10(b), the Court must still evaluate him as a potential representative for the purpose of pursuing common law claims on behalf of the Main Class.

The Court agrees that a representative must be willing and able to make *some* financial commitment to the case. Otherwise the Court cannot ensure that the representative will be conscientious and attentive to the interests of all members of the class. *Rand v. Monsanto Company*, 926 F.2d 596, 599 (7th Cir.1991).[10] Plaintiffs' counsel represented to this Court that Rosenberg would agree to be personally responsible for the payment of his share of costs and expenses of litigation. If this is so, Rosenberg's class obligations will not interfere with his fiduciary obligations under ERISA. *See Capri Optics Profit Sharing v. Digital Equipment Corp.*, 1989 WL 15602 at * 2, 1989 U.S. Dist. LEXIS at 9 (D.Mass.1989). Therefore, this Court will find Plaintiff Rosenberg to be an adequate representative of the Main Class, on the condition that he submit, in writing, within thirty (30) days of this Order, an affidavit stating his intention to accept personal financial responsibility for his share of costs and expenses and setting forth sufficient evidence of his financial ability to do so. In addition, Rosenberg shall obtain the consent of the pension plan participants to this arrangement.

### 3. The Class Period

■ Defendant's final challenge to certification in this case pertains to the appropriate length of the Class Period. Plaintiffs propose that the period run from October 20, 1988 through January 3, 1990, but the defendant claims that the period starts too early and ends too late. At this time, however, subject to limitations imposed by the standing requirements discussed above, this Court will not shorten the proposed period. The allegations in the Complaint concerning events between October 20, 1988 and January 19, 1989 are sufficient to withstand challenge under Rule 9(b). Moreover, though the Court recognizes that class members who purchased securities after October 2, 1989—the date of the

initial disclosure concerning the Bank's loan loss reserves—are in a different position from those who purchased prior to any such disclosures by the Bank, these class members still may have purchased their securities at a somewhat inflated price. Under the plaintiffs' theory, the Bank continued to hide information from the public and, thus, the fraud did not end until *full* disclosure was made on January 2, 1990. *See In re VMS Secur. Litigation*, 136 F.R.D. at —— (refusing to cut off class period where some curative information was still kept hidden from the public).

### 4. Pendant State Claims

■ The plaintiffs have asserted claims for negligent misrepresentation and common law fraud that are based upon the same course of conduct as the federal claims, and plaintiffs seek to certify these claims for class treatment as well.

The recent trend in this Court is to certify the pendant claims, so long as the law of different states either will not apply or will not vary significantly. *See Adair*, at 20; *Perception Technology*, 128 F.R.D. at 171; *Priest v. Zayre Corp.*, 118·F.R.D. 552, 557 (D.Mass.1988). For certification purposes, plaintiffs in this case have persuaded this Court that Massachusetts law should apply to all pendant claims. The defendant Bank is headquartered in Massachusetts, and the alleged misrepresentations occurred, in substantial part, in Massachusetts. The pendant claims, therefore, will be certified.

### 5. Conclusion

Based on the foregoing discussion, Plaintiffs' Motion for Class Certification is granted as follows:

(1) This action shall be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

(2) The Main Class, consisting of all persons who purchased common stock of the

---

**10.** Plaintiffs' reliance on *Rand* for the proposition that a class representative need not bear *any* costs of litigation is misplaced. *Rand* stands for the proposition that a district court may not establish a *per se* rule that a representative plaintiff must be willing to bear *all* (as opposed to a *pro rata* share) of the costs of litigation or be deemed inadequate. *Rand,* 926 F.2d at 601 (emphasis added). It does not obviate a representative's obligation to make some financial commitment to the class action.

Bank on the open market during the period October 20, 1988 through May 9, 1989 and who were damaged thereby, shall be certified with respect to Counts I, VI, and VII of the Complaint. Plaintiff Rosenberg shall be the designated representative of the Main Class.

(3) The Reinvestment Class, consisting of all persons who purchased Bank common stock pursuant to the Bank's Reinvestment Plan during the period October 20, 1988 through January 3, 1990, shall be certified with respect to Counts I, III, IV, VI, and VII of the Complaint. Plaintiff Pate shall be the designated representative of the Reinvestment Class.

(4) The Acquisition Class, consisting of all persons who acquired Bank common stock pursuant to the acquisition by the Bank of BankVermont, shall be certified with respect to Counts III, IV, VI, and VII of the Complaint. Plaintiff Levy shall be the designated representative of the Acquisition Class.

(5) Excluded from all classes are the Bank, its officers and directors, members of their immediate families, and any subsidiary, affiliate or controlled person of any such person or entity.

## SUMMARY JUDGMENT

The defendant filed a motion for partial summary judgment that is also presently before this Court. The defendant has moved for summary judgment dismissing all common law claims for common law fraud and negligent misrepresentation, all claims of Plaintiff Levy and the Acquisition Class, and the Section 10(b) claims of Plaintiff Pate and the Reinvestment Class.

In order to prevail, the defendant must establish that there is an absence of evidence to support plaintiffs' claims. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). The defendant has met this burden here only with respect to certain of plaintiffs' claims.

### Common Law Fraud

■ Plaintiffs have pleaded and argued a fraud on the market case, availing themselves of the presumption of reliance set out in the Supreme Court's decision in *Basic, Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Under the state common law, however, a claim of fraud requires direct or individualized reliance. *Tolan,* 696 F.Supp. at 772. Unless and until Massachusetts courts adopt the fraud on the market theory in the common law fraud context, this Court will not do so. It is not the role of the federal court to create or to extend the law of the state. The law of the Commonwealth that reliance is a constituent element of common law fraud being clear, a federal court has no authority to prognosticate what the law will be, but must follow what the law is. To carve-out the potentially evolving contours of state law is not my prerogative. *But see Hurley v. Federal Deposit Ins. Corp.,* 719 F.Supp. 27, 34 (D.Mass.1989) (Tauro, J.) (permitting plaintiffs to invoke fraud on the market as a substitute for actual reliance in an action for common law fraud). Plaintiffs must prove direct reliance in order to prevail on this claim.

■ At this stage in the proceedings, however, when only limited discovery has been conducted, the Court will not delve into the issue of actual reliance. The Court does not rule out the possibility that plaintiffs may be able to establish direct reliance on the part of the class representatives. Should they be unable to do so, however, the Court will entertain defendant's motion again at a later date, or the Court will address the reliance issue upon a motion for directed verdict at trial.

### Negligent Misrepresentation

■ Defendant moves for summary judgment on the negligent misrepresentation claim of the Main Class on the ground that the class cannot prove an essential element of the claim: privity. A claim for negligent misrepresentation under Massachusetts law requires privity between the parties. Absent privity, the plaintiff must prove that the defendant had actual knowledge of plaintiffs' reliance. *Hurley,* 719 F.Supp. at 34. Neither requirement can be met by the open market purchasers in this case. There is no evidence, and no allega-

tion, that the members of the Main Class were in privity with the Bank. Nor is there evidence that the defendant Bank actually knew the nature and extent of plaintiffs' reliance on its public statements. Indeed, the open market purchasers base their claim upon alleged misrepresentations contained in widely-disseminated information. Summary judgment is granted with respect to the negligent misrepresentation claims of the Main Class. *See id.* (dismissing negligent misrepresentation claim).

Defendant also moves for summary judgment against the two subclasses. At trial the Reinvestment Class and the Acquisition Class will be required to establish direct reliance and defendant's knowledge thereof. However, for reasons already stated, at this early stage the Court will not make a determination as to their ability to do so. Defendant's Motion with respect to the Reinvestment Class and the Acquisition Class is denied.

*Section 11 and Section 12(2) Claims of the Acquisition Class*

 Defendant contends that summary judgment should enter on the claims of the Acquisition Class under Section 11 and Section 12(2) of the Securities Act of 1933. Section 11 relates to misrepresentations contained in a registration statement, while Section 12(2) relates to misrepresentations contained in a prospectus. As grounds for the motion on these claims, defendant states that the Registration Statement and Prospectus pertaining to the acquisition of BankVermont were effective prior to any alleged misrepresentations in the Complaint and, thus, that the allegation that either document was false or misleading is incorrect.

There is no dispute that the Registration Statement and the Prospectus at issue were filed with the SEC in March and April of 1988, more than six months prior to the start of the Class Period. There also seems to be no dispute that these documents were true and accurate at the time they were filed. Plaintiffs' Complaint con-

tains no allegation that either document was misleading as drafted, and plaintiffs raised no such argument at the hearing before this Court. Instead, plaintiffs base their claims on the theory that the Bank had a continuing duty to update the documents until such time as the actual exchange of stock occurred in January, 1989 and that the Bank failed to do so. Plaintiffs also argue that Registration Statement and the Prospectus became misleading because they incorporated by reference other documents and public statements issued by the Bank on a continuing basis throughout the Class Period. (Complaint, ¶¶ 90, 96; *see also* Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Partial Summary Judgment, at pp. 50–53). These alleged *subsequent* omissions and misrepresentations, rather than the documents themselves, form the basis of plaintiffs' claims.

Plaintiffs rely primarily on *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir.1972), to support the proposition that the Bank had a duty to disclose "post-effective developments" which, in plaintiffs' view, "materially alter[ed] the picture presented" in the original Registration Statement and Prospectus. *See id.* at 1095. In *Manor Nursing Centers* the court found that the appellants violated the antifraud provisions of the federal securities laws, Section 17(a), 15 U.S.C. § 77q(a), by failing to disclose four specific events that occurred after the effective date of the prospectus and that rendered the prospectus misleading. *Id.*

Plaintiffs' reliance on this case is misplaced, however. First, *Manor Nursing Centers* did not concern liability under Section 11 or Section 12(2) and, as such, it is not directly applicable in this case. In addition, the facts of *Manor Nursing Centers* distinguish it from the case at bar.

In *Manor Nursing Centers* the appellants engaged in conduct directly contrary to certain representations made in the prospectus.[11] They did so soon after the effec-

11. Specifically, the appellants did not return investors' money even though the issue was not fully subscribed; they did not arrange for an

escrow account for the proceeds of the offering; they sold shares for consideration other than cash; and they arranged for certain individuals

tive date of the prospectus and during the period of the public offering. The court reasoned that these post-effective developments—developments which the appellants *knew* or *should have known* affected the accuracy of the prospectus and which occurred *while the prospectus was in use* by investors—should have been brought to the attention of the public investors. *Id.* This Court agrees with the reasoning of *Manor Nursing Centers;* and had the Bank here engaged in conduct contrary to the terms of the Registration Statement and Prospectus, and had the Bank done so prior to the date on which the shareholders voted to approve the merger, this Court might reach a different decision. Such is not the case, however.

■ Here the Bank allegedly failed to disclose certain facts regarding the financial condition and the projected profitability of the Bank. These omissions, in plaintiffs' view, materially altered "the general conservative picture" presented in the Registration Statement and Prospectus. (Plaintiffs' Memorandum of Law in Opposition to Defendant's Motion for Partial Summary Judgment, at p. 47). Perhaps this information, if disclosed, would have altered the "general picture" of the Bank, but omissions that create a misleading impression— particularly one that is misleading only in *hindsight*—are not sufficient to constitute the basis of a securities action under Section 11 or Section 12(2). *Cf. In re Union Carbide Class Action Secur. Litigation,* 648 F.Supp. 1322, 1327–28 (S.D.N.Y.1986) (dismissing Section 11 and Section 12(2) claims on grounds that alleged omissions were immaterial). Plaintiffs must be able to identify affirmative statements that were misleading at the time the document became effective or that became misleading by material omission. *Id.* at 1326. Indeed, the appellees in *Manor Nursing Centers* identified the affirmative statements

in the original prospectus that became misleading as a result of the appellants' subsequent conduct. Plaintiffs here, however, cannot identify a single statement in either the Registration Statement or the Prospectus that became misleading as a result of the Bank's failure to disclose certain financial information.

Moreover, the Registration Statement and Prospectus at issue in this case were circulated to BankVermont shareholders prior to the May, 1988 shareholder vote on the merger. In May, 1988, when the BankVermont shareholders used the documents and voted to approve the merger, the documents were neither false nor misleading. Once the shareholders approved the merger, the documents were no longer distributed by the Bank. Thus, any alleged omissions occurred *after* the documents had been used. Unlike *Manor Nursing Centers,* there was no offering—no investment decision—still pending.[12] This Court is unaware of any requirement that documents be updated when the documents are no longer in circulation or in use. Plaintiffs, in fact, have cited no authority for such a requirement.

■ Plaintiffs argue alternatively that the Registration Statement and Prospectus incorporated by reference certain other documents and public statements issued by the Bank during the Class Period. Because plaintiffs assert that these documents and statements were misleading, plaintiffs further contend that the Registration Statement and Prospectus became misleading. This argument, however, is equally without merit. The Registration Statement and Prospectus explicitly define and limit the categories of documents that are incorporated by reference. (*See* Affidavit of Janice B. Liva, Exhibits 1 and 2). None of the alleged misleading documents or public statements are explicitly incorpo-

---

to receive extra compensation for their participation in the offering. *Manor Nursing Centers,* 458 F.2d at 1094–95. All of these actions directly contradicted representations in the prospectus. *Id.* at 1091–94.

**12.** Contrary to plaintiffs' assertions, this Court does not find that BankVermont shareholders

had any powers to terminate the merger. The limited powers to terminate rested solely with the BankVermont Corporation (*see* Affidavit of Janice B. Liva, Exhibit 1 ("Merger Agreement") at ¶ 18.3). Thus, plaintiffs cannot prevail on the argument that the individual shareholders still had investment decisions before them.

rated in the Registration Statement and Prospectus.[13] Therefore, summary judgment is granted with respect to the Section 11 and Section 12(2) claims of the Acquisition Class.

*Section 10(b) Claims of the Reinvestment Class*

This Court already has indicated that it will not determine at this time whether a fraud on the market theory is appropriate with respect to Plaintiff Pate and the Reinvestment Class. Defendant's Motion for Summary Judgment on the Section 10(b) claim of the Reinvestment Class, therefore, is denied.

*Conclusion*

Defendant's Motion for Partial Summary Judgment is granted on Count VI as to the Main Class and on Counts III and IV as to the Acquisition Class. As to all other counts, the motion is denied.

SO ORDERED.

---

**13.** Plaintiffs also suggest that these documents and public statements were "incorporated" by way of certain warranty clauses in the 1987 Acquisition Agreement, because the Acquisition Agreement was *attached to* the Registration Statement and Prospectus. This argument also fails. The 1987 Acquisition Agreement was attached to the Registration Statement and Prospectus for informational purposes, but it cannot serve as a basis for liability under Section 11 or Section 12.