**Ken RUDD, On Behalf of Himself and All Others Similarly Situated, Plaintiff,**

v.

**SUBURBAN LODGES OF AMERICA, INC.; David E. Krischer; Dan J. Berman; Terry J. Feldman; James R. Kuse; Michael McGovern; and John W. Spiegel, Defendants.**

No. Civ.A.1:97CV3758 ODE.

United States District Court,
N.D. Georgia,
Atlanta Division.

March 31, 1999.

Martin D. Chitwood, Christi Cannon Mobley, Chitwood & Harley, Atlanta, GA, Andrew L. Barroway, David Kessler, Schiffrin & Barroway, Bala Cynwyd, PA, for plaintiff.

Peter Quirk Bassett, Todd Richard David, John H. Goselin, II, Alston & Bird, Atlanta, Ga, for defendants.

## ORDER

ORINDA D. EVANS, District Judge.

This civil action, alleging violations of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k, 77*l*(a)(2) and 77*o*, and seeking class certification, compensatory damages, rescission, costs and expenses, is currently before the court on Defendants' opposed motion to dismiss.

Plaintiff Ken Rudd ("Plaintiff"), and others similarly situated who purchased or otherwise acquired common stock of Suburban Lodges of America, Inc. ("SLAM"), bring the instant action based on alleged material false and misleading statements and omissions contained in SLAM's Prospectus.

SLAM is a company which develops hotels, some of which are owned by franchisees. Some franchised hotels are managed by SLAM, others are managed by other parties. Prior to May 1996, SLAM's stock was privately held. In May 1996, SLAM went public in an Initial Public Offering ("IPO"). SLAM engaged in a secondary offering in October 1997 ("Offering"), in order to finance the development of additional hotels, for working capital, and other corporate purposes. [Defendants' motion to dismiss at 7–8]. The Prospectus for the offering became effective on October 14, 1997.

On December 15, 1997, SLAM issued a press release, announcing expected earnings of "between $.11 and $.12 a share for the quarter ended December 31, 1997, as compared to $.08 for the same quarter in 1996." [Defendants' motion to dismiss, Ex. A]. The press release also announced that SLAM would suffer a "drag on earnings this quarter, primarily as a result of ... pre-opening expenses and opening expenses," and due to the hotels' late season openings, which is "the slowest season for hospitality companies," resulting in these hotels "leasing up at the longer end of [SLAM's] historical range." [Id.]. The next day, December 16, the price of SLAM's stock dropped.[1] In his complaint, Plaintiff alleges that the stock price dipped because outside analysts had expected higher earnings based on SLAM's Prospectus. [Plaintiff's amended complaint ¶¶ 30, 31].

Apparently Plaintiff and Plaintiff's counsel were not surprised by the decline in the stock price, as the original complaint in this action was filed three days later. While the press release revealed that SLAM's earnings were higher than the previous year, Plaintiff seemingly expected even better results. Defendants argue that Plaintiff's claim is based on nothing more than a drop in the price of SLAM's stock, and that the instant action has all the earmarks of a "strike suit."[2]

After Defendants filed a motion to dismiss on March 13, 1998 based on flaws in Plaintiff's complaint, Plaintiff amended his complaint, by Consent Order dated June 2, 1998. Plaintiff's amended complaint now alleges that "the Prospectus, and the documents incorporated therein, for the Offering were materially false and misleading, contained false statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed adequately to disclose material facts," and that Defendant sellers' "actions of solicitation included participating in the preparation of the false and misleading Prospectus." [Plaintiff's amended complaint ¶¶ 56, 68]. Specifically, Plaintiff claims that in the Prospectus, SLAM falsely described its accounting practices of "expensing"

---

1. Defendants note that SLAM's stock price "subsequently rebounded significantly, but has recently declined again along with most other lodging company stocks." [Defendants' motion to dismiss at 10, n. 10].

2. The Senate Report accompanying the Private Securities Litigation Reform Act of 1995 explained the meaning of strike suits:

> certain lawyers file frivolous "strike" suits alleging violations of the Federal securities laws in the hope that defendants will quickly settle to avoid the expense of litigation. These suits, which unnecessarily increase the cost of raising capital and chill corporate disclosure, are often based on nothing more than a company's announcement of bad news, not evidence of fraud. All too often, the same "professional" plaintiffs appear as named plaintiffs in suit after suit. The Private Securities Litigation Reform Act of 1995 is intended to lower the cost of raising capital by combating these abuses, while maintaining the incentive for bringing meritorious actions.

S.Rep. No. 104–98, 104th Cong. Sess. 4 (1995) U.S.Code Cong. & Admin.News 1995 pp. 679, 683.

pre-opening costs, when such costs were really capitalized. Plaintiff also contends that the description of SLAM's historical hotel occupancy rates as well as SLAM's reported average length of stay in its hotels, were materially false and misleading. [*Id.* at ¶¶ 32–52]. Such omissions and misleading statements purportedly rendered the Prospectus false and misleading in violation of Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Act").

Based upon these alleged violations, Plaintiff brought this class action on behalf of himself and others who purchased or otherwise acquired SLAM's stock by means of Offering on October 14, 1997 ("offering") through December 15, 1997 ("class"), except that in relation to Plaintiff's Section 12(a)(2) and 15 claims, "the class shall consist of those who purchased or otherwise acquired the common stock of SLAM in the offering". [Plaintiff's amended complaint ¶ 1]. The class has not been certified. Plaintiff is suing all of the above named Defendants for violations of Sections 11 and 12(a)(2) of the Act, and the individual Defendants under Section 15, as they allegedly are "control persons" of SLAM within the meaning of the section. Defendants now move to dismiss these claims pursuant to the Federal Rules of Civil Procedure 12(b)(6) for failure to state a claim.[3]

A complaint may not be dismissed under Fed.R.Civ.P. 12(b)(6) " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Rosen v. TRW, Inc.*, 979 F.2d 191, 194 (11th Cir.1992) (*quoting Conley v. Gibson*, 355

U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "All well-pleaded facts in plaintiff['s] complaint and all reasonable inferences drawn from those facts are taken as true." *Oladeinde v. City of Birmingham*, 963 F.2d 1481, 1485 (11th Cir.1992) (citation omitted), *cert. denied, Deutcsh v. Oladeinde*, 507 U.S. 987, 113 S.Ct. 1586, 123 L.Ed.2d 153 (1993). Accordingly, the court treats the assertions made in Plaintiff's complaint as true.

The court will first address Plaintiff's claims under Sections 11 and 12(a)(2). Section 11 of the Securities Act of 1933 provides a cause of action to purchasers of securities if:

> any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading ...

15 U.S.C. § 77k(a). Section 12(a)(2) of the Act provides a cause of action to purchasers of securities when:

> [a]ny person who ... offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material a material fact necessary in order to make the statements, in light of the circumstances in which they were made, not misleading ...

15 U.S.C. § 77*l*(a)(2).[4] In order to assert a securities claim under §§ 11 and 12(a)(2) of the Act, Plaintiff must allege that the Prospectus: (1) contained an untrue state-

---

**3.** Defendants attached the Prospectus and other documents incorporated therein, as well as other documents referred to in Plaintiff's complaint, to their motion to dismiss. Generally speaking, if a matter outside the pleadings is presented to the court, the motion to dismiss becomes one for summary judgment. However, "where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal." *Brooks v. Blue Cross and*

*Blue Shield of Florida,* 116 F.3d 1364, 1369 (11th Cir.1997). Accordingly, the court will consider all exhibits to Defendants' motion to dismiss which Plaintiff refers to in his complaint and that are central to his claims.

**4.** Section 15 provides that "[e]very person who ... controls any person liable under [Sections 11 or 12(a)(2) ] ... shall be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable." 15 U.S.C. § 77*o*.

ment of a material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statements therein not misleading. Further, in order to survive a motion to dismiss, "[Plaintiff's] amended complaint must plead facts establishing that the Prospectus contained a material misrepresentation or omission *on the date it was issued." Taam Assoc., Inc. v. Housecall Medical Resources, Inc.*, Civ. Action No. 1:96–CV–2214A–JEC, slip. op. at 11–12 (N.D.Ga. March 30, 1998) (citations and internal quotation marks omitted) (emphasis added). Therefore, as a threshold matter, a plaintiff must identify a material misstatement or omission of fact in the Prospectus. *Akerman v. Oryx Communications, Inc.*, 609 F.Supp. 363, 367 (S.D.N.Y.), *aff'd*, 810 F.2d 336 (2nd Cir.1987). Statements made after the date of offering are "irrelevant to the issue of what is or is not contained in the Prospectus, and are not actionable under §§ 11 and 12(a)(2) of the Act." *Taam Assoc.*, Civ. Action No. 1:96–CV–2214A–JEC, at 12 n. 4. *See also In re Bank of Boston Corp. Sec. Litig.*, 762 F.Supp. 1525, 1538 (D.Mass. 1991) (plaintiffs "must be able to identify affirmative statements that were misleading at the time the [Prospectus] became effective or that became misleading by material omission"); *In re Keegan Management Co. Sec. Litig.*, 794 F.Supp. 939, 942 (N.D.Cal.1992) ("Because all of Plaintiffs' claims are based on the contents of the prospectus, evidence of information available after [the offering] is irrelevant to the determination of what should have been stated in the prospectus").

As stated above, Plaintiff alleges that the Prospectus contained "false statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and concealed and failed to disclose material facts." [Plaintiff's amended complaint ¶ 68]. SLAM purportedly made such materially false and misleading statements when describing the following in its prospectus: (1) its accounting practice; (2) its "historical" occupancy rates; and (3) its reported aver-

age length of stay. Each contention will be addressed in turn.

First, Plaintiff asserts that the Prospectus failed to disclose SLAM's accounting practice for the recognition of pre-opening expenses. [Plaintiff's amended complaint ¶¶ 3, 36]. Specifically, Plaintiff claims that SLAM's Form 10–K for the fiscal year ending on December 31, 1996 ("1996 10–K"), which is explicitly incorporated by reference into the Prospectus, falsely represented that "pre-opening costs are expensed as incurred," when such expenses were really capitalized. [Plaintiff's amended complaint ¶ 4; Defendants' motion to dismiss, Ex. B, pg. 39]. Plaintiff claims that since these expenses were capitalized instead of expensed, "when a large number of [SLAM's] hotels were opened in the fourth quarter of 1997, expenses ballooned and earnings fell. Thus, the Prospectus' historical financial and operating data was 'not indicative of future operating results,'" a fact that was required to be disclosed in the Prospectus pursuant to 17 C.F.R. § 229.303(a)(3)(iv)(3). [Plaintiff's amended complaint ¶ 41]. Therefore, according to Plaintiff, investors were falsely led to believe, based on the misleading statements of the Prospectus, that SLAM had already absorbed the pre-opening costs for the new hotels opening in the fourth quarter of 1997.

Plaintiff attempts to prove that SLAM's pre-opening costs are capitalized, and not expensed as the Prospectus states, by referring to three separate forms of evidence as comparisons in his complaint: (1) SLAM's post-offering third quarter 1997 balance sheet; (2) SLAM's December 15, 1997 press release; and (3) SLAM's 1996 Annual Report to shareholders.

SLAM's third quarter 1997 report ("10–Q") filed with the SEC "disclosed over a single quarter of $1,0444,519 of SLAM's balance sheet account for 'pre-paid and other assets.'" [Plaintiff's amended complaint ¶ 40]. From this statement, Plaintiff concludes that "pre-paid assets would be the account that would ordinarily hold

capitalized hotel pre-opening costs, so that a sharp increase in the pre-paid assets balance sheet account immediately preceding the quarter in which a large number of hotels were opened would indicate that SLAM, in 1997, was not immediately expensing its pre-opening costs when incurred." [Plaintiff's response to Defendants' motion to dismiss at 5].

However, Defendants state that the "pre-paid expenses and other assets account" ("PEOA") discussed in this 10–Q does *not* include pre-opening costs. [Defendants' reply to the motion to dismiss at 4]. Defendants also note that Plaintiff cannot offer any facts to establish that these costs were capitalized in the PEOA. More importantly, Plaintiff suggests that pre-opening costs include (and presumably the PEOA account capitalized) "costs relating to the development, construction and opening of new hotels." [Plaintiff's response to Defendants' motion to dismiss at 4, n. 2]. However, SLAM's 1996 10–K, which is specifically incorporated into the Prospectus, makes abundantly clear that such costs are in separate accounts. [Defendants' motion to dismiss, Ex. D at F–3, F–9]. The 1996 10–K explicitly states that construction costs are capitalized:

> The hotels are started at cost. Costs directly associated with the construction of the hotels are capitalized until the related project is substantially complete and ready for its intended use.

[*Id.* at F–9, n. 2].

Plaintiff also contends that SLAM's December 15, 1997 press release is further evidence that SLAM capitalized its pre-opening costs. SLAM issued the following press release announcing its fourth quarter earnings:

> Suburban Lodges of America, Inc. (Nasdaq: SLAM) announced today that it expects to earn between $.11 and $.12 a share for the quarter ended December 31, 1997, as compared to $.08 for the same quarter in 1996. David E. Krischer, Suburban's chief executive officer said, "Thirteen of the Company's 26 new hotel openings in 1997 will occur in the final two months of the year. This is causing a drag on earnings this quarter, *primarily as a result of these hotel's pre-opening and opening expenses.* Also, by opening so late in the year, traditionally the slowest season for hospitality companies, more of our new hotels are leasing up at the longer end of our historical range. Other factors affecting this quarter's expected earnings are that three franchised hotels that were due to open in the fourth quarter will not open until first quarter 1998 and same store occupancies for the quarter are lower than in the past, at approximately 85%."
>
> Mr. Krischer further stated that notwithstanding the Company's expected earnings for the fourth quarter, the Company believes that its earnings for the full year 1997 will be up by more than 70% over 1996. "The Company's pipeline is very strong (thirty company-owned properties under construction and/or under development) and we fully expect our strong annual growth to continue into 1998."

[Defendants' motion to dismiss, Ex. A (emphasis added) ]. Plaintiff contends that the phrase highlighted in italics confirms that during the fourth quarter 1997, pre-opening costs were capitalized. This accounting practice, undisclosed by the Prospectus, would "disproportionately impact the quarterly earnings when hotels opened," causing the Prospectus and financial statements incorporated therein to be materially misleading. [Plaintiff's response to Defendants' motion to dismiss at 5–6]. Plaintiff claims that SLAM had an obligation to disclose that the data contained within the Prospectus would not be "indicative of future operating results."

While Plaintiff extracts one portion of the press release to bolster his conclusion, a reading of the entire release does not support his contention. The press release explains that the earnings for the quarter will be affected by hotel openings occurring during a traditionally slow season. It does not distinguish the difference between pre-opening and opening costs, nor

suggest that the pre-opening costs are capitalized. To the contrary, the press release appears to adequately reflect specific disclosures from the Prospectus under its "Seasonality" section, namely that:

> [b]ased upon its past experience, management expects that occupancy and revenues may be lower than normal during the months of November, December, and January due to the holiday season. Because many of [SLAM's] expenses do not fluctuate with occupancy, such declines in occupancy may cause decreases in the Company's quarterly earnings.

[Defendants' motion to dismiss, Ex. B at 23]. Therefore, this evidence is also insufficient to provide a tenable claim that the statement incorporated in the Prospectus that "pre-opening costs are expensed as incurred" was false and misleading.

Plaintiff also relies on SLAM's 1996 Annual Report to shareholders ("1996 Annual Report"), which was filed with the SEC after the offering. In this report, it stated that SLAM's policy "is to expense pre-opening costs during the first month of operation, due to the short stabilization period for its hotels," indicating that hotel pre-opening costs were capitalized. [Plaintiff's response to Defendants' motion to dismiss, Ex. 1 at 6].

Plaintiff does not dispute the fact that the 1996 Annual Report is not incorporated in the Prospectus. While Plaintiff attempts to reference the 1996 Annual Report in order to demonstrate the falsity of the Prospectus, he concedes that the above statement, not incorporated in the Prospectus, covers the period of business practices during 1995, which is *before* SLAM became a public company. Defendants contend that when SLAM became a public company in May 1996, it adopted the accounting policy as stated in the Prospectus, which has not changed since that time. For these reasons, the court finds that the reliance on the 1996 Annual Report provides no basis to support a claim that the statements in the Prospectus were false or misleading.

Plaintiff contends that there is no evidence to support SLAM's claim that it changed its accounting policies, but if it did, then SLAM would have violated Generally Accepted Accounting Principles ("GAAP") and Generally Accepted Auditing Standards ("GAAS") "by making an undisclosed and unjustified change in accounting methods for pre-opening costs," thereby rendering the statements contained in the Prospectus false.[5] [Plaintiff's response to Defendants' motion to dismiss at 7]. Plaintiff does not allege a violation of GAAP (or GAAS) in his complaint.

Defendants counter that this "last ditch effort" by Plaintiff fails because this requirement relates only to material changes in accounting policies of public companies. During the time that SLAM has been a public company, it has never changed its accounting policy. More importantly, Defendants argue that the alleged differences between the two accounting policies are not material.

■ Even assuming arguendo that the aforementioned evidence establishes that the Prospectus was misleading in regards to SLAM's accounting policy, and that in fact, Defendants capitalized, rather than expensed, pre-opening costs after it became a public company, the court finds that the alleged difference in the accounting policies is not material.[6] As stated

---

5. "[GAAP] are the conventions, rules and procedures that constitute the professional standards of the accounting profession." *United States v. Arthur Young & Co.*, 465 U.S. 805, 811 n. 7, 104 S.Ct. 1495, 79 L.Ed.2d 826 (1984). SLAM's 1996 10–K contained an "Independent Auditors Report," which stated that "[Deloitte & Touche LLP] conducted audits in accordance with generally accepted auditing principles," and that in their opinion "the consolidated financial statements ...

present fairly, in all material respects ... the consolidated financial position of [SLAM] ... in conformity with generally accepted accounting principles." [Defendants' motion to dismiss, Ex. D. at 35].

6. "The question of materiality ... is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor.... An omitted fact is material if there is a substantial likelihood that a reason-

above, pre-opening costs do not include the construction of the hotels, or similar large expenditures, as these capitalized costs are identified in a separate account. [Defendants' motion to dismiss, Ex. D at F–3, F–9, n. 2]. Therefore, contrary to Plaintiff's assertion, SLAM did not make material false statements concerning … "its hotel construction program expenses." [Plaintiff's amended complaint ¶ 29]. According to Defendants, pre-opening costs "include modest amounts for such things as a portion of a manager's salary or advertisements." [Defendants' reply to their motion to dismiss at 3]. However, Plaintiff never sets out his definition of pre-opening costs. Thus, even if SLAM made false statements concerning its accounting policy, Plaintiff has not established how these costs created a significant difference in the financial data presented in the Prospectus.

Even if such costs were significant, they would be incurred, whether capitalized or expensed, during the same quarter in most instances. For example, the Prospectus stated that numerous hotels would be opening in the fourth quarter 1997. Because the pre-opening costs would be incurred around the same time as the hotel opening, it is immaterial whether costs were classified as expensed or capitalized. [Defendants' reply to the motion to dismiss at 7]. Finally, it is apparent from the press release that another reason exists for the decline in earnings in fourth quarter 1997, that being the slowdown of the holiday period, combined with a dramatic increase in new hotels. Therefore, taking Plaintiff's assertions as true, the court finds that the Prospectus was not false or misleading in terms of its description of its accounting policy, and even if it were, such differences in accounting are not material as a matter of law.

■ Plaintiff also contends that the descriptions of SLAM's historical hotel occupancy rates in the Prospectus were materially false and misleading. Specifically, Plaintiff alleges that: (1) the statements in the Prospectus that its hotels had reached 90% occupancy within 90 days of opening were false; (2) the Prospectus stated that the average occupancy rate for hotels for January through June 1997 was 87.7%, but omitted less favorable hotel occupancy data for the months of July through September 1997, and (3) SLAM's presentation of individual hotels' 6–month "average" occupancy rates in the Prospectus was misleading because it concealed the fact that SLAM's newer hotels had not reached 90% occupancy within 90 days. [Plaintiff's response to Defendants' motion to dismiss at 9; Plaintiff's amended complaint ¶¶ 44–50].

In his complaint, Plaintiff seems to allege that SLAM's Prospectus made material misrepresentations by omitting occupancy data from July through September because of SLAM's reported proprietary software package that allows SLAM "to process its hotel bookings on an on-going basis." [*Id.* at 9; Defendant's motion to dismiss, Ex. B at 30]. Therefore, it had the ability to report occupancy rates past June 1997. The court finds no basis for this assertion. Plaintiff provides no indication of how SLAM's possession of a software package automatically translates into a requirement that they could, and therefore must, report occupancy data from July through September. More importantly, Plaintiff fails to illustrate how SLAM's failure to include July through September occupancy rate data was a material misrepresentation, as Plaintiff failed to cite any document showing any adverse occupancy trend *prior* to the October 1997 Prospectus.

Plaintiff attempts to illustrate that SLAM was already experiencing declining occupancy rates at the time of the offering, and thereby omitted material facts in its prospectus, by citing statements and documents pertaining to the *fourth* quarter. For instance, Plaintiff points to the December 15, 1997 press release which announced that " 'same store' occupancies

able shareholder would consider it important in deciding how to vote." *TSC Industries,*

*Inc., v. Northway, Inc.,* 426 U.S. 438, 445, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

are lower than in the past, at approximately 85%." [Plaintiff's amended complaint ¶ 47]. However, despite Plaintiff's assertion that the press release was referring to occupancy data available at the time of the offering, the press release explicitly states that the fourth quarter decline was based on the thirteen hotels opening "*in the final two months of the year.*" [Defendants' motion to dismiss, Ex. A]. The press release plainly addresses occupancy data that was not and could not have been presented in the October Prospectus.

▇▇ Plaintiff also attempts to establish the "material omission" by referring to SLAM's 1997 SEC Form 10–K ("1997 10–K"), which stated that:

> Company wide occupancy declined from 89% to 85% primarily because of the ramp-up [7] period associated with the new hotels opened or acquired in 1997.

[*Id.* at Ex. E]. Plaintiff again asserts that the 1997 10–K could not have been referring to the hotels that opened in November and December 1997, but instead referred to hotels which opened during 1997 for which at least three months of occupancy data were available at the time of the October 1997 offering.[8] Plaintiff argues that the statements could not be referring to fourth quarter openings because they had not been open long enough to calculate the occupancy rate of their ramp-up period.

While it is obviously correct that hotels opening in November and December could not have completed their 90–day ramp-up period by December, these openings, the vast majority of which occurred in the fourth quarter, still caused SLAM's overall occupancy to decline after, and not before, the October 1997 offering. Therefore, as these "omissions" were not apparent on the date the Prospectus was issued they

cannot be considered in order for Plaintiff to survive a motion to dismiss.

Finally, Plaintiff asserts that the average length of stay reported in SLAM's prospectus was materially false and misleading. This allegation is utterly without basis in fact or law. The Prospectus stated that the average length of stay for the 11 company-owned hotels open at least one year as of June 30, 1997 was approximately five weeks. The sole "hard" evidence that Plaintiff has to illustrate that this statement was materially false and misleading is a comment made by SLAM's attorney at a Board of Zoning Appeals hearing conducted in Chesterfield, Virginia on March 5, 1997, and in a follow-up hearing on November 21, 1997, in which she stated that the average stay was less than four weeks. [Plaintiff's amended complaint ¶ 52]. SLAM's attorney generally referred to the average stay of "over twenty-four of these hotels across the country"—some of which are company owned, others that are not. [Defendants' motion to dismiss at 17–18]. However, numerous references in the Prospectus make it clear that the length of stay statistic was limited to hotels that had been opened for more than one year. Accordingly, Plaintiff has not alleged any misrepresentation.

Plaintiff's assertions, taken as true, do not provide a tenable legal claim for violations of Sections 11, 12(a)(2) or 15 of the Securities Act. Since Plaintiff has failed to allege that any statement (or omission) contained in SLAM's Prospectus was materially false and misleading, the court need not analyze whether Defendants fall under the ambit of § 12(a)(2) as sellers or whether the individual Defendants qualify as "control persons" under § 15 of the Act. Additionally, the court need not inquire

---

**7.** The "ramp up" period is the period during which occupancy rates climb.

**8.** Plaintiff also cites a second group of "new" hotels, that which had three months of data available at the time of the release but not at the time of the offering. With respect to that

group, apparently only 2 hotels completed their 90–day ramp-up period between October and December 1997, for which "occupancy problems were arguably apparent in December but not in October 1997" [Plaintiff's response to Defendants' motion to dismiss at 11].

into the application of the "bespeaks caution" doctrine, or the "santa fe doctrine."

Accordingly, Defendants' motion to dismiss [# 35] is GRANTED, Defendants' motion to stay the filing of mandatory disclosures [# 24] is DENIED AS MOOT, Plaintiff's motion for reconsideration of the court's September 15, 1998 order dismissing without prejudice Plaintiff's motion to be appointed lead plaintiff and for approval of proposed co-lead counsel and executive committee liaison [# 44] is DENIED AS MOOT, and Plaintiff's motion for oral argument as to the motion for reconsideration and motion to dismiss [# 45] is DENIED.